ORIGINAL
C.T.J.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| V. | § | Cause No. 4:14-CR-131-A |
| | § | |
| | § | |
| OSCAR JAVIER SALINAS (01) | § | |
| | § | |

---

**DEFENDANT'S MOTION FOR DOWNWARD DEPARTURE OR VARIANCE**
**AND SENTENCING MEMORANDUM IN SUPPORT**

---

TO THE HONORABLE JOHN MCBRYDE, UNITED STATES DISTRICT COURT

JUDGE:

Comes now before the Court the Defendant, Oscar Javier Salinas ("Mr.

Salinas" or "Defendant") through counsel, submits this Motion for Downward

Departure or Variance and Sentencing Memorandum in Support of a sentence of 60

months in prison and five years of supervised release with conditions. This sentence

reflects the nature and circumstances of Mr. Salinas' offense and his history and

characteristics, and is "sufficient, but not greater than necessary" to serve the

purposes of sentencing set forth at 18 U.S.C. § 3553(a)(2).

## INTRODUCTION

**A.  Nature and Circumstances of Mr. Salinas' Offense and His History and Characteristics**

Mr. Salinas began viewing child pornography about five years ago. PSI ¶ 9. He obtained his images through the internet by using a free file-sharing program called ARES.  ARES facilitates file-sharing by automatically setting up a folder on the user's computer through which other users may download files kept in the shared-file folder. PSI ¶ 6.

When Mr. Salinas was confronted with his internet child pornography activities by federal agents, he accepted responsibility for his actions, did not try to minimize his conduct, owned up to his behavior and immediately articulated a heartfelt desire to obtain help for his addiction to child pornography. PSI ¶¶ 9, 18.

Although Mr. Salinas' computer contained an extensive volume of child pornography, he did not pay for the images or enter into specific instances of trading images for images. The ARES program costs nothing to install, and provides images in response to queries without any monetary payment or other quid pro quo. When ARES is installed, it automatically defaults to sharing status, and specific, affirmative action is required to override the default sharing mode.  A majority of the images did not depict sexual contact, and multiple copies of the same images were found. PSI ¶¶ 7, 8.

---

Mr. Salinas is an unsophisticated 25 years old.  He has no criminal history whatsoever, and has been gainfully employed since he graduated from Trimble Tech High School in 2007. PSI ¶¶ 35-41, 50-54. He has always been a diligent and valuable employee, and owns his own home in Tarrant County. PSI ¶¶ 52, 55.  At the time of his arrest, Mr. Salinas lived with his parents, who have been married for 27 years.  He has 22-year old sister who is a nursing student in Fort Worth. PSI ¶ 43-45.

Mr. Salinas' family will appear at sentencing to support him.  They believe that this behavior does not accurately represent Mr. Salinas' character, and that he will be successful in his treatment in overcoming his addiction to child pornography. Mr. Salinas is deeply ashamed and remorseful for his actions.

Mr. Salinas was interviewed by Debra L. Moore, LCSW,[1] LPC,[2] LSOTP[3] on October 1, 2014.  Ms. Moore assessed Mr. Selinas' mental condition, and specifically whether he poses any physical danger to children; whether he is likely to repeat the offense or engage in similar activities in the future; the existence of any underlying psychological factors which led him to commit the offense; and recommendations for appropriate treatment.  *See* Report of Deborah L. Moore at 1-2 [Moore Re-

---

[1] Licensed Clinical Social Worker.

[2] Licensed Professional Counselor.

[3] Licensed Sex Offender Treatment Provider.

United States v. Oscar Salinas (01) - Defendant's Motion for Downward Departure or Variance and Sentencing Memorandum in Support

port](included as Appendix I). Ms. Moore found that the testing of Mr. Salinas indicated the clinical syndrome consistent with "generalized anxiety disorder." *Id.* at 1. She found that Mr. Salinas was open and revealing in the interview, thereby providing a high level of validity to the personality assessment. *Id.* Of critical importance, she reported that Mr. Salinas does not exhibit severe personality pathology or evidence of a high risk personality disorder. *Id.* at 1-2. Further, on the Abel Assessment of Sexual Interest, Mr. Salinas exhibited heterosexual gender preference, with a secondary sexual response to adult females. *Id.* at 1-2. Finally, when evaluated utilizing the STATIC 99 and STABLE 2007 risk assessment actuarial instruments, Ms. Moore opined that Mr. Salinas is a mere moderate risk to re-offend, but that his probability of re-offending can be reduced with appropriate treatment. *Id.* at 2. Ms. Moore closed her report with a recommendation that Mr. Salinas be evaluated for psychotropic medication intervention to address his anxiety disorder and to reduce his arousal response, and that he participate in sexual offender treatment. *Id.*

**B.     Legal Framework**

While this Court must still correctly calculate the guideline range, *Gall v. United States*, 552 U.S. 38, 49 (2007), it may not treat that range as mandatory or presumptive, *id.* at 51; *Nelson v. United States*, 555 U.S. 350, 352 (2009), but must treat it as "one factor among several" to be considered in imposing an appropriate

sentence under § 3553(a). *Kimbrough v United States*, 552  U.S. 85, 90 (2007).  The Court must "consider all of the § 3553(a) factors," "make an individualized assessment based on the facts presented," *id.* at 49-50, and explain how the facts relate to the purposes of sentencing. *Id.* at 53-60; *Pepper v. United States*, 131 S. Ct. 1229, 124243 (2011). The Court's "overarching" duty is to "'impose a sentence sufficient, but not greater  than necessary' to accomplish the goals of sentencing." *Id.* at 101; *Pepper*, 131 S. Ct. at 1242-43.

A  key component of Supreme  Court law, designed  to  ensure  that the guidelines are truly  advisory and constitutional, is the authority of this Court to disagree with a guideline as a matter  of policy. Because "the Guidelines are now advisory . . . , as a general matter, courts may vary [from Guidelines ranges] based solely on policy considerations, including  disagreements with the  Guidelines." *Kimbrough*, 552 U.S. at 101-02 (internal punctuation omitted) (citing *Rita v. United States*, 551 U.S. 338, 351 (2007) (district courts may find that the "Guidelines sentence itself fails  properly to reflect § 3553(a) considerations"). As the Supreme Court held in *Kimbrough*, because "the cocaine Guidelines, like all other Guidelines, are advisory only," it "would not be an abuse of  discretion for a district court to conclude when sentencing a particular defendant that the crack/powder disparity yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes,  even in a mine-run case." *Kimbrough*, 552 U.S. at 91, 109-10; *see also Spears v. United States*, 555 U.S. 261, 267

(2009) ("[D]istrict courts are entitled to vary from the crack cocaine Guidelines in a mine-run case where there are no 'particular circumstances' that would otherwise justify a variance from the Guidelines' sentencing range.").

Congressionally directed guidelines are just as advisory as any other guideline and therefore equally subject to policy-based variances. In *Vazquez v. United States*, 130 S. Ct. 1135 (2010), the Supreme Court remanded for reconsideration in light of then-Solicitor General Kagan's position that "all guidelines," including congressionally-directed guidelines, "are advisory, and the very essence of an advisory guideline is that a sentencing court may, subject to appellate review for reasonableness, disagree with the guideline in imposing sentencing under Section 3553(a)." U.S. Br. at 11, *Vazquez v. United States*, No. 09-5370 (Nov. 2009). As the Sixth Circuit has previously recognized, "*all* of the sentencing guidelines are advisory," including those directed by Congress. *United States v. Michael*, 576 F.3d 323, 327 (6th Cir. 2009) (emphasis in original). Congressional directives "tell[] the Sentencing Commission, not the courts, what to do," and "a directive that the Commission specify a particular Guidelines range is not a mandate that sentencing courts stay within it." *Id.* at 328.

This Court may thus properly find that the child pornography guideline was not developed by the Commission in its characteristic institutional role of basing its determinations on empirical data and national experience, *see Kimbrough*, 552 U.S.

at 109-10, consistent with the Supreme Court's repeated recognition that when a guideline was not developed by the Commission based on empirical data of past sentencing practices and national sentencing experience, it is not likely that the guideline "reflect[s] a rough approximation of sentences that might achieve § 3553(a)'s objectives," and that a policy-based variance from such a guideline is not subject to "closer review" and is "not suspect." *See Kimbrough*, 552 U.S. at 109-10; *Spears*, 555 U.S. at 264; *Rita*, 551 U.S. at 348, 349-50.[4]

---

[4] *See also United States v. Grober*, 624 F.3d 592, 600-01 (3d Cir. 2010) (applying abuse of discretion review to a district court's policy-based downward variance from § 2G2.2 because "the Commission did not do what 'an exercise of its characteristic institutional role' required – develop §2G2.2 based on research and study rather than reacting to changes adopted or directed by Congress"); *id.* at 608-09 ("Congress, of course. . . may enact directives to the Commission which the Commission is obliged to implement," but "*Kimbrough* permits district courts to vary even where a guideline provision is a direct reflection of a congressional directive"); *United States v. Dorvee*, 616 F.3d 174, 188 (2d Cir. 2010) (*Kimbrough*'s holding that "it was not an abuse of discretion" for a district court to disagree with the crack guidelines "because those particular Guidelines 'do not exemplify the Commission's exercise of its characteristic institutional role' . . . applies with full force to § 2G2.2."); *United States v. Henderson*, 649 F.3d 955, 959-60 (9th Cir. 2011) ("[T]he child pornography Guidelines were not developed in a manner 'exemplify[ing] the [Sentencing] Commission's exercise of its characteristic institutional role,' . . . so district judges must enjoy the same liberty to depart from them based on reasonable policy disagreement as they do from the crack-cocaine Guidelines discussed in *Kimbrough*."); *id.* 963 n.3 ("That Congress has the authority to issue sentencing directives to the Commission" and "that the Guidelines conform to Congressional directives does not insulate them from a *Kimbrough* challenge."); *United States v. Stone*, 575 F.3d 83, 89-90 (1st Cir. 2009) ("[O]ur precedent has interpreted *Kimbrough* as supplying this power even where a guideline provision is a direct reflection of a congressional directive," including the career offender, fast-track, and child pornography guidelines); *id.* at 93-94, 97 (district court may choose to agree with Congress's policy decisions as long as it recognizes its authority not to, but the "guidelines at issue are in our judgment harsher than necessary" and "we would have used our *Kimbrough* power to impose a somewhat lower sentence"); *United*

In a recent decision, the Sixth Circuit made a distinction between guidelines that are directed by Congress (like much of the child pornography guideline), and guidelines that are chosen by the Commission (like the drug guidelines at issue in *Kimbrough*, which were directly based on congressional policy but not specifically required by Congress). *See United States v. Bistline*, 665 F.3d 758, 763-64 (6th Cir. 2012). With respect to guidelines chosen by the Commission, when the Commission "makes a policy decision for reasons that lie outside its [empirical] expertise," the resulting guideline is "vulnerable on precisely that ground." *Id.* With respect to guidelines directed by Congress, "the district court that seeks to disagree with the guideline on policy grounds faces a considerably more formidable task than the district court did in *Kimbrough*." *Id.* at 764. "[W]ith respect to those enhancements" that were directed by Congress, the district court "must refute. . .Congress's reasons." *Id.* This Court "may still disagree with the policies embodied in [congressional] directives," but "to survive the close scrutiny that follows, the court must explain its disagreement in terms that are persuasive on policy grounds." *Id.* at 763.

---

*States v. Halliday*, 672 F.3d 462, 474 (7th Cir. 2012) (district courts are "at liberty to reject *any* Guideline on policy grounds," but defendant did "not argue that the district court was unaware of its discretion to disagree with the [child pornography] Guidelines"); *United States v. Regan*, 627 F.3d 1348, 1353-54 (10th Cir. 2010) (defendant's argument for a policy-based variance from § 2G2.2 was "quite forceful" but he "did not raise the argument that the Guidelines are entitled to less deference because they are not the result of empirical study by the Commission").

C.    The Sentencing Commission's Report to Congress

In February 2013, the Sentencing Commission released a report to Congress on the child pornography guidelines for non-production offenders. *See* U.S. Sent'g Comm'n, *Report to the Congress: Federal Child Pornography Offenses* (2012) ["*Child Porn Report*"]. The Commission explained that it compiled the report in large part due to the increasing rate of below-guideline sentences for offenders sentenced under USSG § 2G2.2, pursuant to its statutory duty to "consider whether the guidelines are in need of revision in light of feedback from judges as reflected in their sentencing decisions," *id.* at ii, and because "as a result of recent changes in the computer and Internet technologies that typical non-production offenders use, the existing sentencing scheme in non-production cases no longer adequately distinguishes among offenders based on their degrees of culpability." *Id.* at ii, 323. The Commission explained that because the enhancements for computer use and type and volume of images "now apply to most offenders," the guideline "fail[s] to differentiate among offenders in terms of their culpability." *Id.* at iii, xi; *id.* at 209, 323. It explained that "technological changes have resulted in exponential increases in the volume and ready accessibility of child pornography, including many graphic sexual images involving very young victims, a genre of child pornography that previously was not widely circulated." *Id.* at 6. Because "sentencing enhancements that originally were intended to provide additional proportional punishment for

aggravating conduct now routinely apply to the vast majority of offenders," *id.* at xi, the "current guideline does not adequately distinguish among offenders regarding their culpability for their collecting behaviors," *id.* at 323. The cumulative enhancements addressing the content and volume of images possessed, "in addition to base offense levels of 18 or 22, result[] in guideline ranges that are overly severe for some offenders in view of the nature of their collecting behavior." *Id.*

In describing the varying degrees of culpability, the Commission reported that the "typical" child pornography case now involves images depicting "prepubescent children engaging in sexually explicit conduct." *Id.* at 84. Some offenders "acquire enormous and often well-organized collections," sometimes up to hundreds of thousands of images; some "intentionally collect child pornography depicting the sexual torture of children, including infants and toddlers," *id.* at viii, 84-92; and some have collected material over "a series of decades" beginning in the pre-Internet era, *id.* at 80. The variety of images readily available on the Internet and found in offenders' possession ranges from "legal but sexually suggestive poses" to extremely graphic images "depicting violence, humiliation, bondage, and bestiality." *Id.* at 80-81, 90-91. Some offenders "are very discriminating" and limit their collection by preference. *Id.* at 81. Offenders "vary widely in their technological sophistication," with some relatively unsophisticated offenders using widely available peer-to-peer networks, like Lime Wire, to receive or distribute material "in

an indiscriminate manner," while others "use their technological expertise to create private and secure trading 'communities' and to evade, and help others evade, detection by law enforcement." *Id.* at viii, 61-62.

The Commission reported that approximately one quarter of federal offenders "received child pornography from commercial websites, thereby fostering the commercial markets," and one quarter engaged in "personal distribution" to another individual through bartering or trading of images, also described as a "market." *Id.* at 98-99. There is, however, no social science research available to support the theory that criminal punishments "have affected commercial or non-commercial 'markets' in child pornography since the advent of the Internet and P2P filesharing." *Id.* at 98.

The Commission reported that some offenders have "non-sexual motivations for viewing child pornography," including "avoidance of stress or dissatisfaction with life." *Id.* at 79. It reported that recent studies show that "appropriate 'treatment interventions. . .are associated with lower rates of recidivism — some of them very significant,'" *id.* at 278 & n.31 (quoting Center of Sex Offender Management, *The Comprehensive Approach to Sex Offender Management* 5 (2008)), and that "[p]olygraph testing of sex offenders is widely accepted by experts as a critically important corollary of effective treatment." *Id.* at 282.

The Commission reported that "not all child pornography offenders are

pedophiles or engage in other sex offending." *Id.* at 104. Approximately one in three offenders sentenced under § 2G2.2 "have engaged in" what the Commission deems "sexually dangerous behavior," criminal or non-criminal, past or present, based on allegations in PSRs, arrests, and convictions. *Id.* at ix-x, 204-05. However, "the current guideline measures for offender culpability (*e.g.*, for distribution of child pornography, number of images possessed, possession of sado-masochistic images) are generally not associated with significantly higher rates of [criminal sexually dangerous behavior]." *Id.* at 204.

The Commission concluded that "[t]he current sentencing scheme in §2G2.2 places a disproportionate emphasis on outdated measures of culpability regarding offenders' collecting behavior and insufficient emphases on offenders' community involvement and sexual dangerousness." *Id.* at xx; *see also id.* at 321. The Commission asked Congress to enact legislation to provide it authority to amend the guidelines that "were promulgated pursuant to specific congressional directives or legislation directly amending the guidelines." *Id.* at xviii, 322.

The Commission recommends that the specific offense characteristics related to the types and volume of images, distribution, and use of a computer "be updated to account more meaningfully for the current spectrum of offense behavior regarding the nature of images, the volume of images, and other aspects of an offender's collecting behavior reflecting his culpability (*e.g.*, the extent to which an

offender catalogued his child pornography collection by topics such as age, gender, or type of sexual activity depicted; the duration of an offender's collecting behavior; the number of unique, as opposed to duplicate, images possessed by an offender)," and "to reflect offenders' use of modern computer and Internet technologies." *Id.* at xviii-xix, 322-23.

### D.    Requested Sentence

Mr. Salinas asks this court to impose a sentence of no greater that 48 months in custody, and five years of supervised release with the conditions that he register as a sex offender with the State of Texas and undergo any further treatment deemed necessary by the Probation Officer. Unlike the advisory guideline range of 135-168 months in prison, the requested sentence is "sufficient, but not greater than necessary" to serve sentencing purposes under § 3553(a).

Part I of the following Argument shows that Mr. Salinas' offense is less serious than the offenses Congress had in mind, and that Mr. Salinas is not the dangerous offender Congress had in mind, when it required severe penalties in child pornography cases. It explains with factual and empirical evidence that the circumstances of the offense and Mr. Salinas' characteristics are highly relevant to the statutory purposes of sentencing and the overarching duty to impose a sentence that is sufficient, but not greater than necessary, to satisfy those purposes.

Part II demonstrates that the sentence Mr. Salinas requests will avoid

unwarranted   disparities and unwarranted similarities. This section includes sentencing data from all cases nationwide, in the Fifth Circuit, and in the Northern District of Texas.

Part III shows that the sentence requested is consistent with recent caselaw. Part IV provides evidence to refute each of Congress's reasons for its directives to the Commission to enhance the child pornography guideline and again shows that Mr. Salinas is not  the offender Congress had in mind. It also shows that the enhancements the Commission adopted without a congressional mandate were not based on empirical data and national experience. This part also provides an objective basis for the sentence Mr. Salinas requests.

## ARGUMENT

I.    **Given the Nature and Circumstances of Mr. Salinas' Offense and His History and Characteristics, the Sentence Requested Is Sufficient, But Not Greater Than  Necessary, to Satisfy the Purposes of Sentencing.**

In enacting the Sentencing Reform Act, Congress did "not favor[] one purpose of sentencing over another," except that rehabilitation was not to be a reason to impose a sentence of incarceration. *See* S. Rep. No. 98-225, at 67 (1983). Rather, "each of the four stated purposes should be considered in imposing sentence in a particular case," and "one purpose of sentencing may have more bearing on the imposition of sentence in a particular case than another purpose has." *Id.* at 68.  In choosing what kind of sentence to impose, the court "must consider" all of the

purposes and factors set forth in § 3553(a). *Id.* at 119. "Whether [imprisonment] should be imposed when authorized is a question to be resolved after balancing all the relevant considerations." *Id.; see also United States v. Bridgewater*, 479 F.3d 439, 442 (6th Cir. 2007) ("often one or two [purposes] prevail, while others pale").

Here, all of the purposes of sentencing point in the same direction. Mr. Salinas' offense is less serious than the offenses Congress had in mind, and Mr. Salinas is not the dangerous offender Congress envisioned. Lengthy incarceration is not necessary to protect the public, and would be a particularly harsh punishment for Mr. Salinas, who is 25 years old and is a first offender who has never even been arrested for any criminal offense prior to now, and has never attempted to make contact with a minor for sexual purposes. PSI ¶ 10, 41. Mr. Salinas' assessment, education and employment history point to a moderate risk of further offending. As a sex offender who has acknowledged his addiction to child pornography and desire for treatment, his already moderate likelihood of re-offending is even further reduced.

## II.  Need for Just Punishment in Light of the Seriousness of the Offense, 18 U.S.C. § 3553(a)(2)(A)

### 1.  *Seriousness of the offense*

Congress's actions with respect to the child pornography guideline have stemmed in large part from the belief that those who view child pornography are

actually child molesters.[5] Under this view, punishing child pornography possessors

serves as a proxy for punishing child sexual abusers. Aside from the lack of evidence

to support this belief in general, *see Child Porn Report* at 104 (confirming that "not all

child pornography offenders are pedophiles or engage in other sex offending"),[6]

---

[5] *See* 137 Cong. Rec. S10323 (July 18, 1991) (Senator Helms) (in support of
directing increase to base offense level from 10 to 13); *id.* at H6736, H6738 (Sept. 24,
1991) (Representative Wolf) (same); 141 Cong. Rec. S5509 (Apr. 6, 1995) (Senator
Grassley) (in support of directing additional increase in base offense level from 13 to
15); 144 Cong. Rec. S12262 (Oct. 9, 1998) (Senator Hatch) (in support of directing
expanded reach of "distribution" enhancement); 149 Cong. Rec. S5126 (Apr. 10, 2003)
(Senator Hatch) (in support of Feeney Amendment, which included number-of-images
enhancement); *see also generally* Child Pornography Prevention Act of 2006, Pub. L. No.
104-208, § 121, 110 Stat. 3009, 3009-26 (1996); S. Rep. No. 108-2, at 3 (2003); S. Rep. No.
104-358, at 12-14 (1996); USSG app. C, amend. 592 (Nov. 1, 2000).

[6] In the past, some would argue that with child pornography collectors, there is a
"high incidence of previously undisclosed contact offenses against children," citing the
"Butner study." However, one of the Butner study's authors has since recanted, stating
that "the argument that the majority of [child pornography] offenders are indeed
contact sexual offenders and, therefore, dangerous predators . . . simply is not
supported by the scientific evidence." Andres E. Hernandez, *Psychological and Behavioral
Characteristics of Child Pornography Offenders in Treatment*, at 4 (2009),
http://www.iprc.unc.edu /G8/Hernandez_position_paper_Global_Symposium.pdf.
And the study has been thoroughly discredited by others. *See* Melissa Hamilton, *The
Child Pornography Crusade and its Net Widening Effect*, 33 Cardozo L. Rev. 1679, 1703-10
(2012); Written Statement of Richard Wollert, Ph.D. before the U.S. Sent'g. Comm'n, at
10-14, 18 (Feb. 15, 2012); Richard Wollert *et al.*, *Federal Internet Child Pornography
Offenders – Limited Offense Histories and Low Recidivism Rates*, in The Sex Offender,
Volume VII (Barbara K. Schwartz ed., 2012); Statement of Heather E. Williams Before
the U.S. Sent'g Comm'n, Phoenix, Ariz., at 49-51 (Jan. 21, 2010). A number of courts
have rejected the Butner study as a basis for punishment, along with the notion that a
defendant may be punished based on speculation that he might be a child molestor.
*See, e.g.*, *United States v. C.R.*, 792 F. Supp. 2d 343, 375-76 (E.D.N.Y. 2011); *United States v.
Phinney*, 599 F. Supp. 2d 1037, 1045 n.10 (E.D. Wis. 2009); *United States v. Johnson*,
588 F. Supp. 2d 997, 1005 (S.D. Iowa 2008); *see also United States v. Apodaca*, 641 F.3d
1077, 1087 (9th Cir. 2011) (Fletcher, J., concurring).

---

Mr. Salinas has not been convicted of sexually abusing a child, has not in fact sexually abused a child, and is at present (pre-treatment) only a moderate risk of harming a child. *See* Moore Report 2. This distinguishes Mr. Salinas from the offenders Congress had in mind, and is therefore highly relevant. *See United States v. Marshall*, 870 F. Supp. 2d 489, 491-92 (N.D. Ohio 2012) (rejecting presumption that "those who view child pornography are indistinguishable from those who actually abuse children," finding instead that the "[e]mpirical data strongly suggests that viewing child pornography does not equate to child molestation"); *United States v. Kelly*, 868 F. Supp. 2d 1202, 1207-08 (D.N.M. 2012) (rejecting government's argument that guideline range is appropriate because of the "chance that [defendant] will molest children in the future, or that he has in the past," as this "speculation is directly contrary to submissions by Kelly's therapist and Kelly's psychiatrist," the defendant "has never been accused of hands-on abuse," "empirical testing disproves the fear that the typical child pornography defendant will go on to molest children," and "[a]ny Guideline based on unsupported fears, rather than actual evidence, is far more likely to render an unreasonable sentence"); *United States v. Cruikshank*, 667 F. Supp. 2d 697, 703 (S.D. W.Va. 2009) ("Rarely able to catch the monsters that create the images, society reflexively nominates the consumers of this toxic material as proxies for the depraved producers and publishers."); *United States v. Phinney*, 599 F. Supp. 2d 1037, 1045 n.10 (E.D. Wis. 2009) ("[C]ourts should not assume that a

defendant has or will commit additional crimes without a reliable basis."); *United States v. Grober*, 595 F. Supp. 2d 382, 404 (D.N.J. 2008) ("[T]he Court cannot make [Defendant] a surrogate for the monsters who prey on child victims through actual contact."), *aff'd* 624 F.3d 592 (3d Cir. 2010). The Commission confirms that the possession of even large numbers of images, including sado-masochistic images, is "generally not associated with significantly higher rates of [criminal sexually dangerous behavior]." *Child Porn Report* at 204.

Another primary justification for severely punishing child pornography possessors is that they support the market for child pornography and thus encourage the abuse of more children in order to create new images. *See* 136 Cong. Rec. S4730 (Apr. 20, 1990). Aside from the evidence that disproves this belief in general, *see* Part IV.A.2, *infra*, Mr. Salinas did not pay for or enter into any specific quid pro quo agreements to trade any images. Moreover, there is no communication or contact between ARES users: Just as ARES did not notify Mr. Salinas when it shared images from his computer with the FBI agent, ARES did not notify the person(s) from whose computer(s) it obtained images it sent to Mr. Salinas. Indeed, as an FBI agent testified in another case, when law enforcement downloads files from Lime Wire,[7] it is not contributing to the global demand for child pornography

---

[7] Lime Wire is also a peer-to-peer file sharing network. *See e.g., United States v. Stults*, 575 F.3d 834, 854 (8th Cir. 2009).

and not causing any new child pornography to be made because the files already exist and no financial or other incentive is given.[8]

Under these circumstances, where no economic or other incentive was given to anyone to create or post more or newer images, there was "no market effect" from Mr. Salinas' actions. Troy Stabenow, *A Method for Careful Study: A Proposal for Reforming the Child Pornography Guidelines*, 24 Fed. Sent'g Rep. 108, 124-25 (2011) [Stabenow, *A Method for Careful Study*]. There is no research to support the theory that criminal punishments have affected the child pornography markets since the advent of the Internet and file sharing programs. *Child Porn Report* at 98.

In addition, technology has changed the nature of this offense. In the past, child pornography had to be obtained in a risky and secretive manner for substantial sums of money, whereas today, images of child pornography are available for free in the privacy of one's home, with no planning and minimal effort. As a result, less dangerous people commit this offense than was previously the case, even though the guideline range is much higher than it was previously. Before widespread dissemination on the Internet, only those bold enough to seek out child pornography by contacting suppliers directly or through the mail were able to obtain it. In 1994 and 1995, the government prosecuted a total of only 90 defendants convicted

---

[8] Tr. of Sent'g Hr'g at 31-32, *United States v. Bistline*, No. 2:09-cr-00085-JLG-TPK (S.D. Ohio Jan. 7, 2010) (explanatory footnote added).

of possessing, receiving, or distributing child pornography, and only 24% used a computer. *See* U.S. Sent'g. Comm'n, *Report to the Congress: Sex Crimes Against Children* 29 (1996) [U.S. Sent'g Comm'n, *1996 Report*]. In 2011, the government prosecuted 1,645 defendants convicted of possessing, receiving, or distributing child pornography, and 97.4% used a computer. U.S. Sent'g. Comm'n, *Use of Guidelines and Specific Offense Characteristics* (2011); U.S. Sent'g Comm'n, *2011 Sourcebook of Federal Sentencing Statistics*, tbl.17.

The Internet, by rendering child pornography immediately and anonymously accessible, has "facilitate[d]. . .a new kind of crime" that in most cases would not otherwise have been committed. *See* Andreas Frei *et al.*, *Paedophilia on the Internet – A Study of 33 Convicted Offenders in the Canton of Lucerne*, 135 Swiss Med. Weekly 488, 492 (2005); *see also* Jérôme Endrass *et al.*, *The Consumption of Internet Child Pornography and Violent Sex Offending*, 9 BMC Psychiatry 43, 44 (2009); L. Webb *et al.*, *Characteristics of Internet Child Pornography Offenders: A Comparison with Child Molesters*, 19 Sexual Abuse 449, 450 (2007). In short, the change in technology is relevant, in part, because it means that even as the population of child pornography offenders has become less dangerous, punishment has greatly increased. *See* Richard Wollert, PhD, *The Implication of Recidivism Research and Clinical Experience For Assessing and Treating Federal Child Pornography Offenders: Written Testimony Presented to the U.S. Sentencing Commission* at 4-5 (Feb. 15, 2012).

According to the Commission, "technological changes have resulted in. . . ready accessibility of child pornography," including graphic sexual images of very young victims, which "previously was not widely circulated." *Child Porn Report* at 6. Now that the "typical" child pornography case involves images depicting "prepubescent children engaging in sexually explicit conduct," *id.* at 84, the current guideline "does not adequately distinguish among offenders regarding their culpability for their collecting behaviors" and is "overly severe for some offenders in view of the nature of their collecting behavior," *id.* at 322-23, such as those like Mr. Salinas who did not deliberately or discriminatingly select their images, *id.* at 84-92.

While Mr. Salinas intentionally accessed and viewed child pornography, *see* 18 U.S.C. § 2252A(a)(5), he did not knowingly share files. Any distribution that occurred was the automatic result of the ARES program. As the Federal Trade Commission has explained, "[s]ome users may not understand the configuration of the P2P file-sharing software's 'shared folder' and may inadvertently share sensitive personal files residing on their hard drives." Staff Report, Federal Trade Commission, *Peer-to-Peer File-Sharing Technology: Consumer Protection and Computer Issues* 7 (2005). "Some consumers may distribute [child pornography] files unintentionally" because "P2P file-sharing software often is configured so that any file a user downloads is automatically made available for redistribution to anyone

else using the software." *Id.* at 11. That is what happened here. "Because of the nature of peer-to-peer file sharing programs, a simple possessory crime evolves into a distribution offense as soon as someone accesses a shared file." *United States v. Strayer,* 2010 WL 2560466, at *12 (D. Neb. June 24, 2010). The Commission acknowledges that the guidelines should, but do not, distinguish among offenders based on their technological sophistication. *See Child Porn Report,* at viii, xix, 56-62.

In determining an appropriate sentence, this Court must consider the sentences available by statute. *See* 18 U.S.C. § 3553(a)(3). Congress set the statutory range of imprisonment for Mr. Salinas' offense at zero to twenty years, and authorized a term of probation. *See* 18 U.S.C. § 2252A(a)(5), (b)(2); 18 USC § 3561(c)(1); 18 USC § 3559(a)(3). As many courts have observed, the child pornography guideline, by enhancing sentences based upon factors that are inherent in the crime and thus appear in nearly every case, concentrates offenders at or near the statutory maximum and thus fails to meaningfully distinguish more serious offenders from less serious offenders.[9] As the Sixth Circuit has observed, sentences at or near the statutory maximum should be reserved for the "worst possible variation of the crime" committed by the most dangerous offender. *See United States*

---

[9]*See, e.g., United States v. Durham,* 618 F.3d 921, 931 n.7 (8th Cir. 2010); *United States v. Dorvee,* 616 F.3d 174, 187 (2d Cir. 2010); *United States v. Kelly,* 868 F. Supp. 2d at 1208-09; *United States v. Beiermann,* 599 F. Supp. 2d 1087, 1105 (N.D. Iowa 2009); *Cruikshank,* 667 F. Supp. 2d at 702.

*v. Aleo*, 681 F.3d 290, 302 (6th Cir. 2012); *cf. United States v. Poynter*, 495 F.3d 349, 354 (6th Cir. 2007) ("not all repeat sex offenders deserve" to be sentenced at the statutory maximum; "otherwise, Congress would not have set a statutory range of 0-60 years").

   In *United States v. Bridgewater*, 479 F.3d 439 (6th Cir. 2007), cited by the Sixth Circuit in *Poynter* as the kind of case in which a child pornography possessor *would* be deserving of the statutory maximum, the Sixth Circuit affirmed a 10-year statutory-maximum sentence. The district court had concluded that Bridgewater was "too dangerous" to be "placed on probation and sent back into the community." *Id.* at 440. He took "photographs of [himself] molesting young girls who were in [his] care" while running a home for abused and neglected children, successfully concealed these offenses and his criminal past from others "despite [his] continued proximity to youth in church programs," and his own son "condemned" him and "questioned his remorse and sincerity" in a letter to the court. *Id.* at 440-42. The Sixth Circuit has also given examples of factors that in general might justify a sentence at or approaching the statutory maximum as, for example, fleeing from authorities, failing to accept responsibility, using violence, or having prior convictions for of sex offenses with children. *See Aleo*, 681 F.3d at 302; *Poynter*, 495 F.3d at 354.

   The Fifth Circuit has held that a statutory maximum sentence was appropriate

where a defendant convicted of receipt of child pornography had sent pornographic and child pornography images — some of which contained violent imagery — to someone he believed was a minor, and encouraged that person to send him pornographic images of himself. *See United States v. Meuir*, 344 Fed. Appx. 3, 7-8 (5th Cir. 2009) (unpublished).

Mr. Salinas' conduct and characteristics could not be farther from these, yet his guideline range approaches the statutory maximum. He has never improperly touched a child, he has never communicated with a child in a sexual manner, he did not intentionally enter into a quid pro quo file sharing agreement, he admitted what he had done as soon as the agents appeared with a search warrant, and he has fully accepted responsibility for his offense. Ms. Moore concluded that he presents only a moderate risk of ever harming a child. Moore Report at 2. His family reports that this behavior was not consistent with his character and believes that he will never engage in that kind of behavior again. Mr. Salinas is the offender for whom a *minimal* statutorily authorized punishment is reserved.

One of the goals of the SRA was to provide for proportionality in punishment among offenses of different seriousness. S. Rep. No. 98-225, at 45-46 (1983). The child pornography guideline fails that goal, as several courts have noted. *See, e.g., United States v. Dorvee*, 616 F.3d 174, 187 (2nd Cir. 2010); *United States v. Beiermann*, 599 F. Supp. 2d 1087, 1106 (N.D. Iowa 2009); *Cruikshank*, 667 F. Supp. 2d at 702. A

defendant who used a computer to entice a 12-year-old to engage in illegal sexual

activity, but was caught before actually having sex with the child, would receive an

offense level of 30, *see* § 2G1.3(a)(3), (b)(3), three levels *below* Mr. Salinas' offense

level under § 2G2.2. In order to receive an offense level of 33 as Mr. Salinas did for

viewing child pornography, one could, for example, attempt to commit first degree

murder, *see* § 2A2.1(a)(1); commit rape resulting in more than serious but less than

permanent bodily injury, *see* § 2A3.1(a)(2), (b)(4); hold a person in involuntary

servitude for over a year by use of a weapon and cause permanent bodily injury, *see*

§ 2H4.1(a)(1), (b)(1), (b)(2), and (b)(3); or rob a bank of $800,000, while brandishing

a weapon and causing bodily injury, *see* § 2B3.1(a), (b)(1), (b)(2), (b)(7). Mr. Salinas

recognizes the great harm inflicted on the victims depicted in these images, and the

need to obtain treatment for his pornography addiction. Moore Report at 1.

### 2.   *Just punishment*

Mr. Salinas must register as a sex offender, with the publication of that

information to the community and his friends and neighbors. As several courts

have recognized, collateral consequences of conviction, such as registration as a sex

offender, are relevant to the "need" for the sentence imposed to reflect just

punishment. *See, e.g., United States v. Garate*, 543 F.3d 1026, 1028 (8th Cir. 2008) (on

remand from the Supreme Court for reconsideration in light of *Gall*, overruling its

prior holding that it was inappropriate for the district court to consider the lasting

effects of being required to register as a sex offender); *United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (in a case involving a conviction for possession of child pornography after *Gall*, affirming the district court's finding that the defendant "warranted a lower sentence because he lost his teaching certificate and his state pension as a result of his conduct," because "[c]onsideration of these facts is consistent with § 3553(a)'s directive that the sentence reflect the need for just punishment," *id.* § 3553(a)(2)(A), and "adequate deterrence," *id.* § 3553(a)(2)(B)); *United States v. Gardellini*, 545 F.3d 1089 (D.C. Cir. 2008) (affirming below-guideline sentence based in part on court's findings that defendant suffered substantial mental and personal stress as a result of his prosecution, because the court's findings "were directly relevant to the § 3553(a) analysis, which requires sentences to reflect, among other things, "the history and characteristics of the defendant," the need to "protect the public from further crimes of the defendant," the need to "provide just punishment for the offense," and the need to "afford adequate deterrence").

Further, 48 months is a substantial sentence. As shown by Table 14 included as Appendix II, in 2013 the national median sentence for child pornography defendants in criminal history category I was 84 months. *See* Table 14. Though the requested sentence falls below the median, Mr. Salinas' offense does not involve any live children in any way, he immediately accepted full responsibility for his actions, and has expressed remorse and a desire for treatment. Moore Report at 1-2.

**B.    Need for Adequate Deterrence, 18 U.S.C. § 3553(a)(2)(B)**

The empirical evidence is unanimous that there is no relationship between sentence length and general or specific deterrence, regardless of the type of crime. *See* Andrew von Hirsch *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding that "correlations between sentence severity and crime rates. . .were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects"); Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 2829 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . .Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence."); David Weisburd *et al.*, *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 Criminology 587 (1995) (finding no difference in deterrence for white collar offenders between probation and imprisonment); Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, 48 Criminology 357 (2010) (study of over a thousand offenders whose sentences varied substantially in prison time and probation found that such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned

by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame").

The Sentencing Commission has found that "[t]here is no correlation between recidivism and guidelines' offense level. . . .While surprising at first glance, this finding should be expected. The guidelines' offense level is not intended or designed to predict recidivism." U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 15 (2004) ["U.S. Sent'g Comm'n, *Measuring Recidivism*"]. *See also* Part IV.A.3, *infra*. And according to "the best available evidence, . . .prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen *et al.*, *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

Nor does lengthy imprisonment of child pornography possessors have any deterrent or preventive effect on the production or dissemination of child pornography. As explained further in Part IV.A.2, *infra*, this is in part because the production and dissemination of child pornography is a widespread, international problem. There is no evidence "remotely supporting the notion that harsher punishment would reduce the flow of child pornography on the Internet." *Beiermann*, 599 F. Supp. 2d at 1103; *id.* at 1103-04 ("[W]e cannot sentence Internet users and sharers of child pornography fast enough or long enough to make a dent in the availability of such material on the Internet," and while deterrence is a

"laudable" goal, it "is not being achieved according to any empirical or other evidence in this case or, for that matter, empirical evidence in any other case or source that I am aware of."). The Commission acknowledges that there is no social science research supporting the theory that criminal punishments "have affected commercial or non-commercial 'markets' since the advent of the Internet and P2P file-sharing." *Child Porn Report* at 98.

## C.    Need for Incapacitation, 18 U.S.C. § 3553(a)(2)(C)

A primary assumption underlying Congress's actions with respect to the child pornography guideline has been that possessors of child pornography are likely to sexually abuse children.[10] This belief is contrary to the empirical research in general, and is unjustified based on the evidence in this case.

Current empirical research demonstrates that "first-time child pornography possession only offenders appear to be very low risk of sexual recidivism [of any kind], in contrast to those with any prior or concurrent criminal convictions or those who engage in other sexual offending (e.g., attempted or actual contacts with a child, production of child pornography)," Written Statement of Michael C. Seto, Ph.D., C. Psych. before the U.S. Sent'g. Comm'n at 4 (Feb. 15, 2012),[11] and "online

---

[10] *See* note 2, *supra*, and Part IV.A.1, *infra*.

[11] Available at http://www.ussc.gov/Legislative_and_Public_Affairs/Public_Hearings_and_Meetings/ 20120215-16/Testimony_15_Seto.pdf.

offenders who had no history of contact offenses almost never committed contact sexual offenses." Michael C. Seto *et al., Contact Sexual Offending by Men With Online Sexual Offenses*, 23 Sexual Abuse 124, 137 (2011); *see also* Written Statement of Richard Wollert, Ph.D. before the U.S. Sent'g. Comm'n, at 14-17, 21-22 (Feb. 15, 2012) (reporting that in his study of 72 federal child pornography offenders under supervision, including three production offenders, with varying criminal histories, two were arrested for possessing child pornography and none were arrested for a contact offense within four years);[12] Helen Wakeling *et al., Comparing the Validity of the RM 2000 Scales and OGRS3 for Predicting Recidivism by Internet Sexual Offenders*, 23 Sexual Abuse: J. Res. & Treatment 146, 164 (2011) (child pornography offenders "do not, as a group, present a significant risk of escalation to contact sexual offenses."); Jérôme Endrass *et al., The Consumption of Internet Child Pornography and Violent Sex Offending*, 9 BMC Psychiatry 43 (2009) (study that followed 231 child pornography offenders for six years after initial offenses found that only two offenders (0.8%) committed a contact offense, and only nine offenders (3.9%) committed a non-contact sexual offense, and concluded that "the consumption of child pornography alone does not seem to represent a risk factor for committing

---

[12] Available at
http://www.ussc.gov/Legislative_and_Public_Affairs/Public_Hearings_and_M eetings/ 20120215-16/Testimony_15_Wollert_2.pdf.

hands-on sex offenses. . .at least not in those subjects without prior convictions for hands-on sex offenses"); Michael C. Seto & Angela W. Eke, *The Criminal Histories and Later Offending of Child Pornography Offenders,* 17 Sexual Abuse 201, 207-08 & tbl.III (2005) (finding that 1.3% of those who had committed child pornography offending only recidivated with contact sex offenses; "our finding does contradict the assumption that all child pornography offenders are at very high risk to commit contact sexual offenses involving children."); L. Webb *et al., Characteristics of Internet Child Pornography Offenders: A Comparison with Child Molesters,* 19 Sexual Abuse 449, 463 (2007) (finding Internet-only offenders "significantly less likely to fail in the community than child molesters," and concluding that "by far the largest subgroup of internet offenders would appear to pose a very low risk of sexual recidivism").

As one district court recently put it, "the empirical literature [] generally concludes that there is little — if any — evidence of a direct correlation between viewing child pornography and the viewer's commission of 'contact' sexual offenses." *Marshall,* 870 F. Supp. 2d at 492.

Not only are child pornography offenders at low risk to re-offend in general, but on the STATIC-99, Mr. Salinas scored in the next to lowest risk category. Moore Report at 2. There is no evidence that Mr. Salinas has a severe personality pathology or evidence of a high risk personality disorder, with an indication that his risk of re-offending is moderate, with a prognosis that his risk rate could be lowered with

treatment. *Id.* at 2. With the motivation and desire for treatment which Mr. Salinas has articulated and demonstrated, he is very unlikely to engage in any further child pornography offenses.

The Commission's research also demonstrates that employment, education, and family ties and responsibilities all predict reduced recidivism, *see* U.S. Sent'g Comm'n, *Measuring Recidivism* at 12-13 & Ex. 10; U.S. Sent'g Comm'n, *Recidivism and the "First Offender"* 8 (2004), as does substantial other research.[13] For sex offenders, cognitive behavioral therapy substantially reduces recidivism. U.S. Dep't of Justice, Center for Sex Offender Management, *Understanding Treatment for Adults and Juveniles Who Have Committed Sex Offenses* 10 (2006).

As the Commission reports, recent studies show that "appropriate 'treatment interventions. . . .are associated with lower rates of recidivism — some of them very significant'" *Child Porn Report* at 278 & n.31 (citing a project funded by the Department of Justice), and that "[p]olygraph testing of sex offenders is widely

---

[13]*See* Miles D. Harer, Federal Bureau of Prisons, Office of Research and Evaluation, *Recidivism Among Federal Prisoners Released in 1987*, at 5-6, 54 (1994), http://www.bop.gov/news/research_projects/ published_reports/recidivism/oreprrecid87.pdf; Correctional Service Canada, *Does Getting Married Reduce the Likelihood of Criminality*, Forum on Corrections Research, Vol. 7, No. 2 (2005); Robert J. Sampson & John H. Laub, *Crime and Deviance Over Life Course: The Salience of Adult Social Bonds*, 55 Am. Soc. Rev. 609 (1990); Robert J. Sampson, John H. Laub & Christopher Winer, *Does Marriage Reduce Crime? A Counterfactual Approach to Within-Individual Causal Effects*, 44 Criminology 465, 497-500 (2006); Shirley R. Klein *et al.*, *Inmate Family Functioning*, 46 Int'l J. Offender Therapy & Comp. Criminology 95, 99-100 (2002).

United States v. Oscar Salinas (01) - Defendant's Motion for Downward Departure or Variance and Sentencing Memorandum in Support

Page 32 of 61

accepted by experts as a critically important corollary of effective treatment." *Id.* at 282.

In short, Mr. Salinas' strong family support, education, history of gainful employment, and prospective treatment strongly support the conclusion that he is most unlikely to re-offend. While a small minority of defendants convicted of possessing child pornography may again view child pornography and an even smaller minority may molest children, Mr. Salinas is not one of them. The sentence should reflect the fact that Congress's contrary assumption is unfounded in this case. All of the evidence indicates that Mr. Salinas will never view child pornography again. A sentence of 48 months followed by five years of supervised release with appropriate conditions is more than sufficient to ensure that he never does.

## II.   The Requested Sentence Avoids Unwarranted Disparities and Unwarranted Similarities.

This Court must consider the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Whether any difference among sentences is warranted or unwarranted depends on the individual circumstances of each case and their relationship to the purposes of sentencing.

"Unwarranted disparity is defined as different treatment of *individual* offenders who are similar in relevant ways, or similar treatment of *individual*

offenders who differ in characteristics that are relevant to the purposes of sentencing." U.S. Sent'g Comm'n, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System Is Achieving the Goals of Sentencing Reform* 113 (2004).

As shown above in Part I and below in Part IV, the guideline calculation gives heavy weight to factors based on assumptions about the seriousness of the offense and general deterrence that are unfounded in general and particularly in this case. The guideline range fails to take into account any of Mr. Salinas' characteristics demonstrating that there is no need to imprison him for a lengthy period to protect the public and that treatment and rehabilitation will be achieved in the most effective manner with the requested sentence. In this case, a substantial variance is necessary to avoid unwarranted uniformity between Mr. Salinas and dissimilar defendants who committed dissimilar conduct. *See Gall*, 552 U.S. at 55 (in imposing a sentence of probation, district court appropriately "avoid[ed] unwarranted similarities").

This Court must also weigh sentencing practices in other courts against the § 3553(a) factors in this case and any unwarranted disparity created by the guideline itself. *Kimbrough*, 552 U.S. at 108. The data show that a sentence of 48 months in custody, and supervised release for five years would not create unwarranted disparity.

In fiscal year 2011, only 32.8% of defendants sentenced under § 2G2.2 nationwide received a sentence within the guideline range, and 65.6% were below the range. Judges imposed below-range sentences in 48.1% of cases without a government motion, in 14.6% of cases based on a government motion for a variance, and in 3% of cases based on a government motion under § 5K1.1. *See* U.S. Sent'g Comm'n, *2011 Sourcebook of Federal Sentencing Statistics*, tbl.28. In contrast, the average rate of below-range sentences without a government motion in all cases was only 17.4% and the government sought variances in only 4.4% of all cases. *Id.*, tbl.N. In fiscal year 2011, forty-seven defendants sentenced under § 2G2.2 nationwide received no imprisonment or a term of imprisonment no more than six months, and forty-four of these defendants were in Criminal History Category I like Mr. Salinas.[14] Of those forty-four defendants in Criminal History Category I, four had an offense level (unadjusted for acceptance of responsibility) of 33 (like Mr. Salinas) or more. *Id.* at 5.

Nationwide in fiscal year 2011, 46.3% of defendants sentenced under § 2G2.2 in Criminal History Category I were sentenced to a term of imprisonment of less than five years. *See* Appendix IV Table at 4. In that same time period nationally, 38.9% of defendants with a base offense level of 33 were sentenced to less than five

---

[14] *See Placement of Sentences Under U.S.S.G. §2G2.2–FY 2011* at 4, http://www.fd.org/docs/select-topics---sentencing/ placement-of-sentences-under-u-s-s-g-2g2-2---fy-2011.pdf?sfvrsn=4.

years.  *See* Appendix IV Table at 5.

1.   **The Guideline Rests on Congressional Assumptions That Are Contrary to Empirical Evidence and Commission Action Unsupported By Empirical Evidence, and Recommends a Sentence That Is Greater than Necessary to Serve the Purposes of Sentencing or Any Other Sound Policy Goal.**

In the time since the guideline for possession of child pornography was first promulgated, the offense level applicable to Mr. Salinas' offense before acceptance of responsibility has risen by 21 levels, from 12 to 33, and the applicable range has risen from 6-12 months to 97-121 months, an increase of more than **1,600%.**

### Effect on Mr. Salinas' Guideline Range Over Time

| Past Practice | | Not a crime |
|---|---|---|
| 1991 – Original Guideline | 10 | Base Offense Level |
| § 2G2.4 | 2 | Prepubescent minor |
| | <u>-2</u> | Acceptance of responsibility |
| | **10** | **6-12 months** |
| | | |
| 1991 Amendments | 13 | Base Offense Level |
| § 2G2.4 | 2 | Prepubescent minor |
| | 2 | 10 or more items |
| | <u>-2</u> | Acceptance of responsibility |
| | **15** | **18-24 months** |
| | | |
| 1996 Amendments | 15 | Base Offense Level |
| § 2G2.4 | 2 | Prepubescent minor |
| | 2 | 10 or more items |
| | 2 | Possession as a result of computer use |
| | <u>-3</u> | Acceptance of responsibility |
| | **18** | **27-33 months** |
| | | |
| 2003 Amendments | 15 | Base Offense Level |

| § 2G2.4 | 2 | Prepubescent minor |
|---|---|---|
| | 2 | 10 or more items |
| | 4 | Sadistic or masochistic conduct |
| | 2 | Possession as a result of computer use |
| | 5 | More than 600 images |
| | -3 | Acceptance of responsibility |
| | **27** | **70-87 months** |

| 2004 Amendments | 18 | Base Offense Level |
|---|---|---|
| § 2G2.2 | 2 | Prepubescent minor |
| | 2 | Distribution |
| | 4 | Sadistic or masochistic conduct |
| | 2 | Use computer for possession of the material |
| | 5 | More than 600 images |
| | -3 | Acceptance of responsibility |
| | **30** | **97-121 months** |

Most of this massive increase was mandated by Congress. Under the Sixth Circuit's decision in *Bistline,* with respect to enhancements mandated by Congress, this Court may refute Congress's reasons, whether "empirical" or "value judgments," "in terms that are persuasive on policy grounds." 665 F.3d at 763, 764. With respect to enhancements adopted by the Commission without a congressional mandate *and* without empirical grounds, the guideline is vulnerable precisely on that ground. *Id.* at 764.

In *Kimbrough,* the Supreme Court addressed the crack guidelines, which were not directly mandated by Congress but which the Commission based on congressional policy, and refuted Congress's reasons for its policy. 552 U.S. at 94-99. Likewise, Congress, in dictating much of the content of § 2G2.2, relied on "assumptions...that

---

more recent research and data no longer support." 552 U.S. at 97. In other respects, the Commission adopted enhancements without a congressional mandate and without empirical grounds. Analogous to the Commission's later "regret" over having based the crack guideline on the mandatory minimum statute, 665 F.3d at 763, the Commission has now released a report that recommends ameliorating changes to the child pornography guideline. *See Child Porn Report* at 320-24.

Meanwhile, the Sixth Circuit's account of Congress's reasons in *Bistline* is incomplete and in part inapposite. It cited two sources for the "grounds" of congressional action in raising offense levels under § 2G2.2: (1) a directive to the Commission set forth in Pub. L. No. 108-21, § 513(c) (2003), and (2) an observation by the Commission that "Congress has demonstrated its continued interest in deterring and punishing child pornography offenses." 665 F.3d at 764.

The directive cited by the court in *Bistline* is not relevant to the guideline range in this case. It stated that the "Commission shall review and, as appropriate, amend the Federal Sentencing Guidelines and policy statements to ensure that the guidelines are adequate to deter and punish conduct that involves a violation of" 18 U.S.C. § 2252A(a)(3)(B), which criminalized pandering, "or" 18 U.S.C. § 2252A(a)(6), which criminalized distribution of child pornography to a minor for purposes of inducing the minor to participate in illegal activity. Pub. L. No. 108-21, § 513(c) (2003). Mr. Salinas was not convicted of either offense, and the directive had

no effect on his guideline range. The Commission's general observation that Congress was interested in deterring and punishing child pornography offenses will be addressed below in connection with its reasons for directives that affected the guideline range in this case.

In order to assist this Court in refuting Congress's reasons, the history of the child pornography guideline as it affected Mr. Salinas' guideline range is set forth in Appendix III.

## A.   Current Evidence Refutes Congress's Reasons for Increasing Penalties.

As set forth in Appendix III, Congress directed the Commission to take four actions relevant to Mr. Salinas' guideline calculation: (1) increase the base offense level from 10 to 13 in 1991; (2) increase the base offense level from 13 to 15 in 1995; (3) expand the definition of "distribution" to include "non-pecuniary interest"; and (4) add the 2-level enhancement for use of a computer. Congress itself added the 4-level enhancement for materials depicting sadistic or masochistic conduct and the number-of-images table, which included the 5-level enhancement for 600 or more images.

Congress did not make formal findings in support of any of these actions, but its reasons can be gleaned from the legislative history. This history suggests that Congress acted on three primary beliefs: (1) child pornography possessors are pedophiles who use pornography to sexually abuse children; (2) increasing penalties

for possessors will dry up the market and thereby prevent the sexual abuse of children by removing the market incentive for those who abuse children for the purpose of producing new images; and (3) severe penalties will deter others from possessing child pornography. Each belief is based on assumptions that current empirical evidence refutes.

1.   *The belief that child pornography possessors are pedophiles who use pornography to molest children*

When it directed the Commission in 1991 to increase the base offense level from 10 to 13, Congress acted on the belief that those who possess child pornography are actually predatory child molesters who use pornography to desensitize, lure, entice, or coerce children to be sexually abused. *See, e.g.*, 137 Cong. Rec. S10323 (July 18, 1991) (Senator Helms) (stating that "child pornography plays a central role in child molestations by pedophiles" and is "directly connected to child molestation," citing a congressional commission report stating that pedophiles use child pornography to "lower a child's inhibitions in order to sexually abuse the child"); *id.* at H6736, H6738 (Sept. 24, 1991) (Representative Wolf) ("[T]hose who receive child pornography through the mails are often also involved in the actual sexual abuse of children – or at the very least meet the psychological profile of those likely to engage in molesting children."). When Congress directed the Commission in 1995 to increase the base offense level from 13 to 15, its discussion focused on

"predatory pedophiles [who] sell, purchase and swap" child pornography to "satisfy prurient desire." 141 Cong. Rec. S5509 (Apr. 6, 1995) (Senator Grassley).

When it directed the Commission to define "distribution" to include distribution for "a nonpecuniary interest," Congress focused on stalkers and abductors who use child pornography to "lower the inhibitions of potential targets." 144 Cong. Rec. S12262 (Oct. 9, 1998) (Senator Hatch). And while there was never any direct discussion in Congress of the enhancements for material depicting sadistic or masochistic conduct or the number-of-images table, Congress referred to child pornography as a "tool used by pedophiles to break down the inhibitions of children" and "act out their perverse sexual fantasies" in support of the Feeney Amendment, which added these enhancements. *See* 149 Cong. Rec. S5126 (Apr. 10, 2003) (Senator Hatch). Under this view, punishing child pornography possessors serves as a proxy for punishing child sexual abusers.

However, as explained in Part I.A.1, *supra*, this belief is not supported by current research. In brief, "the evidence to date strongly and rather consistently shows that child pornography consumption itself does not represent a risk factor for contact sexual crimes." Melissa Hamilton, *The Child Pornography Crusade and Its Net-Widening Effect*, 33 Cardozo L. Rev. 1679, 1723-24 (2012). Instead, "multiple studies show that child pornography offenders are at a much lower risk for contact sexual offending than previously known contact offenders." *Id.* at 1723. Moreover,

United States v. Oscar Salinas (01) - Defendant's Motion for Downward Departure or Variance and Sentencing Memorandum in Support

Page 41 of 61

studies show that a finding of pedophilia "is not synonymous with either contact sexual abuse or child pornography." *Id.* at 1715. The "Butner study," cited by Senator Hatch in support of the Feeney Amendment, has since been thoroughly discredited and rejected as a basis for punishment. *See* note 3, *supra*. The Commission confirms that "not all child pornography offenders are pedophiles or engage in other sex offending." *Child Porn Report* at 104.

Mr. Salinas has not been convicted of sexually abusing a child, has not in fact sexually abused a child, and is at no higher than a moderate risk of harming a child. This distinguishes Mr. Salinas from the offenders Congress had in mind.

Nor is there any evidence that the nature or number of images possessed bear on the likelihood that an offender is a child molester. When Congress added the enhancement for sadistic or masochistic materials to § 2G2.4 for possession offenses, it simply mirrored the same enhancement the Commission had added to § 2G2.2 for trafficking offenses in 1990, which in turn mirrored the same enhancement under § 2G3.1, the adult obscenity guideline. *See* U.S. Sent'g Comm'n, *History* at 15 n.68. The § 2G3.1 enhancement, in turn, was not based on empirical evidence; indeed, the Commission had proposed eliminating it but retained it for the sole reason that the Department of Justice objected to its removal. U.S. Sent'g Comm'n, *Working Group on Child Pornography and Obscenity Offenses and Hate Crime* 42, 45 (1990).

The Commission confirms that technological advances have made large

numbers of graphic images readily available so that the "typical" child pornography

case now involves images depicting "prepubescent children engaging in sexually

explicit conduct," and over twothirds of possession-only offenders receive the

enhancement for images depicting sadistic or masochistic conduct. *Child Porn Report*

at 84, 209. At the same time, the enhancement for  possession of sado-masochistic

images are "generally not associated with significantly higher rates of [criminal

sexually dangerous behavior]." *Id.* at 204. This comports with other available

evidence, which shows that the level of severity of the images possessed does not

correlate to an increased risk of committing another child pornography offense or

a contact offense. *See* Jody Osborn *et al., The Use of Actuarial Risk Assessment Measures*

*with UK Internet Child  Pornography Offenders*, 2 J. Aggression, Conflict & Peace Res.

16, 19 (2010).

   The number of images chosen by Congress in its table is arbitrary, and so low

that "the  majority of defendants receive the highest possible enhancement." *Kelly*,

868 F. Supp. 2d at  1209.  With the Internet and programs like Lime Wire, "it takes

only marginally more effort to  collect 10,000 images than it does to collect ten."

Stabenow, *A Method for Careful Study*, at 124. The Sentencing Commission has now

acknowledged that "technological changes have resulted in  exponential increases

in the volume and ready accessibility of child pornography," *Child Porn Report* at 6,

and that as the result, the current enhancement for number of images "does not

adequately distinguish among offenders regarding their culpability for their collecting behaviors," and is overly severe for some offenders. *Id.* at 323. It also recommends that the enhancement be updated to account for "the number of unique, as opposed to duplicate, images possessed by an offender." *Id.* And, as with the enhancement for the nature of the images, the Commission confirms that the enhancement for number of images possessed is not "generally not associated with significantly higher rates of [criminal sexually dangerous behavior]." *Id.* at 204. Thus, not only is the number-of-images enhancement "not linked to any empirical data pertaining to sentencing and the purposes of punishment," *see United States v. Schinbeckler,* 2011 WL 4537907, at *6 (N.D. Ind. Sept. 29, 2011), but according to the views of the Sentencing Commission, it is particularly unsuited for those who, like Mr. Salinas, acquired more than 600 images, many of them duplicates, and who never paid for or entered into a quid pro quo agreement to trade images.

2.   *The belief that severe punishment for possession will dry up the market and prevent the abuse of children*

In initially criminalizing the possession of child pornography, Congress acted on the view that those "who possess and view" child pornography represent the "market" for the production of child pornography, and that punishing child pornography possessors will dry up the market and thereby reduce demand for the abuse of children in order to produce child pornography. 136 Cong. Rec. S4730 (Apr.

20, 1990) (Senator Thurmond). It relied on this same view when it directed the Commission to increase the base offense level in 1991. *See* 137 Cong. Rec. S10323 (July 18, 1991) (Senator Helms) ("[W]e must increase the sentencing levels for child porn if we want to stop child molestations and put a dent in the child porn trade.").[15] And when it directed the Commission to add the 2-level enhancement for use of a computer, Congress was concerned with deterring the online distribution and trade of child pornography. 141 Cong. Rec. S5509 (Apr. 6, 1995) (Senator Hatch) (purpose was to "increase[e] penalties for the use of computers in connection with the distribution of child pornography," in part to "ensure that [the information super] highway is not littered with the debris of child pornography"); *see also id.* (Senator Grassley) (purpose was to "discourage child pornographers from using computers to trade in child pornography").

But Congress was mistaken. The production, trading, and viewing of child pornography takes place in a global market that cannot be significantly impacted by severe penalties in the United States. Many countries do not have laws aimed at child pornography, and of those that do, many do not criminalize the possession of

---

[15]The Sixth Circuit has also indirectly relied on this view when it found "inexplicable" a district court's assessment that a higher sentence in a very similar case will not advance the goal of general deterrence. *See Bistline*, 665 F.3d at 767 (citing *United States v. Camiscione*, 591 F.3d 823, 834 (6th Cir. 2010), which in turn relied on the Seventh Circuit's view that "[t]he logic of deterrence suggests that the lighter the punishment for downloading and uploading child pornography, the greater the customer demand for it and so the more will be produced")).

child pornography. John Carr, Commonwealth Internet Governance Forum, *A Joint Report on Online Child Protection Combatting Child Pornography on the Internet* 19 (2010). As a result, there is a large, international legal market for child pornography that exists whether Mr. Salinas is incarcerated for one day or ten years. This market is not organized, but is mostly comprised of amateur collectors who can freely and easily obtain images, increasingly via peer-to-peer networks, *see* United Nations Office on Drugs and Crime, *The Globalization of Crime: A Transnational Organized Crime Threat Assessment* 13 (2010) ["UNDOC, *Globalization of Crime*"], and thus does not operate by the ordinary rules of supply and demand. In this context, severe punishment of a marginal consumer can have little impact on the proliferation of child pornography on the Internet. The Sentencing Commission acknowledges that there is no social science research to support the theory that criminal punishment affects the child pornography markets since the advent of the Internet and file sharing programs. *Child Porn Report* at 98.

Moreover, while Congress was concerned that computers would make it easy for dangerous offenders to disseminate and trade images, it did not tailor the computer enhancement to meet that concern. Instead, it required the Commission increase penalties for those who are not dangerous and who did not use the computer in the ways Congress imagined. The Commission has recognized that the enhancement sweeps too broadly and indicated that the use of a computer might

appropriately be considered an aggravating factor only when it was used to widely disseminate pornography or to make it accessible to children. *See* U.S. Sent'g Comm'n, *1996 Report*, at 28-30 & n.23; *see also Dorvee*, 616 F.3d at 95 (recognizing the Commission's criticism); *Phinney*, 599 F. Supp. 2d at 1042 ("[S]ome computer users are more harmful than others, yet the enhancement provided no distinction."). Here, Mr. Salinas did not use his computer to to make images accessible to children. He is not the offender Congress had in mind.

Most important, there is no empirical evidence to support the assumption that children are abused for the sole or primary purpose of creating child pornography for dissemination. UNDOC, *Globalization of Crime* at 214 ("[I]n most cases, the images are generated as a result of the abuse, rather than the abuse being perpetrated for the purpose of selling images."); *see also* Janis Wolak *et al.*, *Arrests for Child Pornography Production: Data at Two Time Points from a National Sample of U.S. Law Enforcement Agencies*, 16 Child Maltreatment 184, 192-93 (2011) (The data "suggest that online distribution often was not a motivation for [child pornography] production."). Even Congress has since recognized that "the production of child pornography is a byproduct of, and not the primary reason for, the sexual abuse of children." Pub. L. No. 108-21, § 501 (2003).

Accordingly, several courts have found that there is no evidence "remotely supporting the notion that harsher punishment would reduce the flow of child

pornography on the Internet." *Beiermann*, 599 F. Supp. 2d at 1103; *id.* at 1103-04 (noting that while deterrence is a "laudable" goal, it "is not being achieved according to any empirical or other evidence in this case or, for that matter, empirical evidence in any other case or source that I am aware of."); *United States v. Stern*, 590 F. Supp. 2d 945, 952 n.5 (N.D. Ohio 2008) ("The Court is...forced to note the somewhat limited impact of domestic prosecution for a fundamentally international crime. . . .[N]o court should be deluded into believing that limiting domestic consumption alone can eradicate the international market for child pornography."); *Kelly*, 2012 WL 236 7084, at *5 ("The Court is aware of absolutely no evidence suggesting that increased penalties for the consumers of child pornography have decreased the swell of child pornography produced or posted to the internet, or deterred 'hands-on' abuses against children. To the contrary, while prosecutions of child pornography have skyrocketed, prosecutions of actual sexual abuse of children have remained constant."). They recognize that possessing even large numbers of images does not affect the market. *Id.* at *7 ("[T]he tragic realities are such that downloading 500 widely-available images has virtually no effect on the market. Sadly, the worldwide market for child pornography is so vast that the relative impact of several hundred additional images is minuscule, yet results in a significant increase in the guideline range.") (internal quotation and citation omitted); *United States v. Raby*, 2009 WL 5173964, at **6-7 (S.D. W. Va. Dec.

30, 2009) ("The worldwide market for child pornography is so vast that the relative market impact of [] having even 592 additional images is miniscule.").

    3.    *The belief that punishing possessors of child pornography will deter the commission of child pornography offenses*

Congress has also apparently relied on the view that severe penalties will deter others from possessing child pornography. In support of criminalizing the possession of child pornography, Senator Thurmond said that "tough penalties . . . will be a deterrent to those who would sexually exploit children." 136 Cong. Rec. S9029 (June 28, 1990). One court, referring to Congress's actions over the years with regard to child pornography offenses, said it is "clear" that Congress was interested in "deterrence" whenever it acted to increase the guideline range. *Bistline*, 665 F.3d at 764. But to the extent that Congress believed that increasing penalties will deter others from possessing child pornography, it was mistaken. As shown in Part I.B, *supra*, empirical research is unanimous that more severe sentences do not decrease the likelihood that others will commit crimes.

To the extent that Congress meant to deter child pornography possessors themselves from committing further crimes, all of the empirical research is in agreement that imprisonment does not reduce recidivism. *See, e.g.,* Tina L. Freiburger & Brian M. Iannacchione, *An Examination of the Effect of Imprisonment on Recidivism,* 24 Crim. Just. Stud. 369, 377 (2011) ("The results indicate that incarcera-

tion did not affect either offenders' likelihood of recidivating or the severity of recidivism."); Howard E. Barbaree *et al., Canadian Psychological Association Submission to the Senate Standing Senate Committee on Legal and Constitutional Affairs* 6 (Jan. 2012) ("Psychology researchers have identified effective methods, or 'what works', to reduce crime–the overwhelming consensus of the literature is that treatment works, incarceration does not.").[16] As Judge Roger Warren, President Emeritus of the National Center for State Courts, stated in 2007: "The research evidence is unequivocal that incarceration does not reduce offender recidivism." Roger Warren, National Center for State Courts, *Evidence-Based Practice to Reduce Recidivism: Implications for State Judiciaries* 11 (2007).[17] Instead, "[i]ncarceration actually results in slightly increased rates of offender recidivism." *Id.*[18] In other words, "across the

---

[16]
*Available at*
http://www.cpa.ca/docs/file/Government%20Relations/SenateCommitteeSubmission_ January302012.pdf.

[17]*Available at* http://nicic.gov/library/files/023358.pdf.

[18] *See also* Mark W. Lipsey and Francis T. Cullen, *The Effectiveness of Correctional Rehabilitation: A Review of Systematic Reviews,* 3 Ann. Rev. L. Soc. Sci. 297, 302 (2007) ("[R]esearch does not show that the aversive experience of receiving correctional sanctions greatly inhibits subsequent criminal behavior. Moreover, a significant portion of the evidence points in the opposite direction – such sanctions may increase the likelihood of recidivism. The theory of specific deterrence inherent in the politically popular and intuitively appealing view that harsher treatment of offenders dissuades them from further criminal behavior is thus not consistent with the preponderance of available evidence."). A recent Missouri study shows "that recidivism rates actually are lower when offenders are sentenced to probation, regardless of whether the offenders have prior felony convictions or prior prison incarcerations." Missouri Sentencing Advisory Commission, *Probation Works for Nonviolent Offenders,* 1 Smart Sentencing 1

offender population, imprisonment does not have special powers in persuading the wayward to go straight. To the extent that prisons are used because of the belief that they reduce reoffending more than other penalty options, then this policy is unjustified." Francis T. Cullen *et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011) ("[H]aving pulled together the best available evidence, we have been persuaded that *prisons do not reduce recidivism more than noncustodial sanctions*."). As for why this is so, the Commission and scholars have identified numerous "criminogenic" effects of incarceration, including that prison serves as a school for criminals; severs ties to family and community; diminishes employment options upon release; and reduces rather than increases the inmate's willingness or ability to conform to social norms.[19]

Instead, treatment works. The Commission reports that recent studies show that "appropriate 'treatment interventions. . .are associated with lower rates of

---

(June 2009), http://www.courts.mo.gov/file.jsp?id=45429. On a three-year follow up from the start of probation or release from prison, first or second-time offenders on probation were incarcerated at a significantly lower rate (36%) than those who had been sent to prison (55%). *Id.*

[19]*See generally* Martin H. Pritikin, *Is Prison Increasing Crime*, 2008 Wis. L. Rev. 1049, 1054-72 (cataloging eighteen criminogenic effects of incarceration); Lynne M. Vieraitis, Tomaslav V. Kovandzic, & Thomas B. Marvel, *The Criminogenic Effects of Imprisonment: Evidence from State Panel Data 1974*2002, 6 Criminology & Pub. Pol'y 589, 614-16 (2007); *see also* U.S. Sent'g Comm'n, Staff Discussion Paper, *Sentencing Options under the Guidelines* 19 (1996) (recognizing imprisonment has criminogenic effects, including contact with more serious offenders, disruption of legal employment, and weakening of family ties).

recidivism — some of them very significant,'" *Child Porn Report* at 278 & n.31 (quoting Center of Sex Offender Management, *The Comprehensive Approach to Sex Offender Management* 5 (2008)), and that "[p]olygraph testing of sex offenders is widely accepted by experts as a critically important corollary of effective treatment." *Id.* at 282.

In sum, each of Congress's actions rested on unfounded assumptions. As the Commission has noted, congressional directives "creat[e] anomalies in the guidelines structure" and "new sentencing disparities," and "are potentially in tension with the fundamental Sentencing Reform Act objectives of delegating to an independent, expert body in the judicial branch of the government the finer details of formulating sentencing policy, and revising that policy in light of actual court sentencing experience over time." U.S. Sent'g Comm'n, *Mandatory Minimum Penalties in the Federal Criminal Justice System* 122-23 (1991). Yet, as shown next, the relevant amendments promulgated by the Commission by its own choice were also without empirical support.

### B.  The Commission's Choices Were Not Based on Empirical Evidence or National Experience.

As set forth in Appendix 3, when Congress directed the Commission to define "distribution" to include distribution for a "nonpecuniary interest," Congress did not direct the Commission to add the 2-level enhancement for distribution that

applies in Mr. Client's case. Nor did Congress direct the Commission to consolidate § 2G2.4 with § 2G2.2 in 2004, which resulted in the application of the distribution enhancement in simple possession cases regardless of *mens rea* and regardless of the purpose of the distribution. The Commission also chose to increase the base offense level from 15 to 18, and to count each video as 75 images. Each action was done without empirical support.

*Distribution not for pecuniary gain, thing of value, or to a minor, and without mens rea.* The Commission provided no empirical basis for adding the 2-level enhancement for distribution that is not for pecuniary gain or "thing of value," or to a minor. USSG App. C, amend. 592 (Nov. 1, 2000); USSG § 2G2.2(b)(3)(F). Instead, it referred to "congressional concerns" that "pedophiles" distribute pornography over the Internet "to desensitize children to sexual activity, to convince children that sexual activity involving children is normal, and to entice children to engage in sexual activity." It did not give any reason for increasing sentences for those sentenced under § 2G2.2 who did not engage in that conduct, and thus were not the object of Congress's concern.

Moreover, when the Commission consolidated § 2G2.4 with § 2G2.2, the result was that the enhancement now applies in simple possession cases whenever there was *any* distribution of any kind, and regardless of *mens rea*, a result the Commission did not explain or even acknowledge. The extremely wide net thus cast by the

Commission ensnares those, like Mr. Salinas, whose distribution was not to any children, but only as a by-product of the operation of the ARES program. The Commission now acknowledges that offenders "vary widely in their technological sophistication," with some relatively unsophisticated offenders, like Mr. Salinas, using peer-to-peer networks like ARES or Lime Wire to distribute material "in an indiscriminate manner," while others, more culpable than Mr. Salinas, "use their technological expertise to create private and secure trading 'communities' and to evade, and help others evade, detection by law enforcement." *Child Porn Report* at viii, 61-62. Because it "fail[s] to differentiate among offenders in terms of their culpability," the enhancement results in overly severe sentences for offenders like Mr. Salinas. *Id.* at iii, xi, 209, 323. In short, the enhancement goes far beyond congressional concerns, is not based on empirical data, does not further any sentencing purpose, and is unsound.

*Increase to base offense level from 15 to 18.* In 2004, the Commission increased the base offense level in possession cases from 15 to 18 "because of the increase in the statutory maximum term of imprisonment from 5 to 10 years" as part of the PROTECT Act, "and to maintain proportionality with [the new five-year mandatory minimum for] receipt and trafficking offenses," the guidelines for which were calibrated to "reach or exceed" the mandatory minimum in nearly every case. USSG, App. C, amend. 664 (Nov. 1, 2004); *see also* U.S. Sent'g Comm'n, *History* at

44-46. In other words, the Commission simply "looked to the mandatory minimum sentences set in the [PROTECT] Act, and did not take account of 'empirical data and national experience.'" *Kimbrough*, 552 U.S. at 109; *see also Bistline*, 665 F.3d at 763-64 (Commission "simply lifted the ratio off the rack of" the mandatory minimum statute, "not tak[ing] account of empirical data and national experience," and was "vulnerable on precisely that ground").

*Counting each video as 75 images.* In 2004, the Commission decided to count "[e]ach photograph, picture, computer, or computer-generated image, or any similar visual depiction [as] one image." USSG, App. C, amend. 664 (Nov. 1, 2004); USSG § 2G2.2 cmt. (n.4(B)(ii)). It further instructed that each "video, video-clip, movie, or similar recording shall be considered to have 75 images." *Id.* The Commission did not provide any reason for this change. It later explained that the Department of Justice had proposed subjecting each video to a 2- or 3-level enhancement, that it had accepted that position, and it counted each video as 75 images so that a single video would receive a 2-level enhancement under Congress's number-of-images table. *See* U.S. Sent'g Comm'n, *History* at 43-44 (explaining that it selected 75 images because it is "squarely in the middle of the 2-level increase range"). In other words, the Commission's choice to use 75 images for each video was not based on empirical evidence, but was based on the Department of Justice's request and Congress's number of images table, which itself was adopted without explanation or

justification. The Commission provided no evidence that persons who possess videos as opposed to still images are more culpable or present a greater risk of harm.

### C. Enhancements That Apply In Nearly Every Case Do Not Serve Their Purpose.

The enhancements for material involving prepubescent minors, material depicting sadistic or masochistic conduct, use of a computer, and number of images apply in nearly every case sentenced under § 2G2.2. In fiscal year 2011, 95.3% of defendants received the 2-level enhancement for material involving prepubescent minors; 79.4% received the 4-level enhancement sadistic or masochistic material; 97.4% received the 2-level enhancement for use of a computer"; and 96% received at least a 2-level enhancement based on the number of images, with most (70.9%) receiving the 5-level enhancement for 600 images or more. U.S. Sent'g Comm'n, *Use of Guidelines and Specific Offense Characteristics* (2011).

These circumstances thus describe conduct that is "essentially inherent to the crime itself," not aggravating factors describing a more serious offense or higher risk of harm. *Kelly*, 868 F. Supp. 2d at 1208-09. As one court of appeals has recognized, enhancements that apply in "almost every case" are contrary to the purpose of enhancements, which "are meant to increase a sentence for conduct more aggravated than the typical type of offense." *Robinson*, 669 F.3d at 778 (discussing the enhancement for "use of a computer"). Such enhancements render § 2G2.2 an

"anomaly." *Id.*

The Sentencing Commission confirms that "sentencing enhancements that originally were intended to provide additional proportional punishment for aggravating conduct now routinely apply to the vast majority of offenders," *id.* at xi, so that the "current guideline does not adequately distinguish among offenders regarding their culpability for their collecting behaviors," *id.* at 323. Because the enhancements for computer use and type and volume of images "now apply to most offenders," the guideline "fail[s] to differentiate among offenders in terms of their culpability." *Child Porn Report* at ii, xi, 209, 323.

### D.    The Original Guideline Is a More Appropriate Starting Point.

Based on the above analysis, this Court has ample grounds to decline to follow § 2G2.2 "in terms that are persuasive on policy grounds." *Bistline*, 665 F.3d at 763, 764. The ability to disagree on policy grounds "necessarily permits adoption of a replacement [range]." *Spears*, 555 U.S. at 265; *see also Phinney*, 599 F. Supp. 2d at 1043 (declining to follow the 2008 version of § 2G2.2, and noting that "[b]ased on the Commission's initial approach, which was based on study, defendant's guideline range in this case would have been 6-12 months").

The only guideline based, at least in part, on the Commission's "characteristic institutional role," and thus arguably sound, is the original guideline promulgated by the Commission in 1991. That guideline reflected the Commission's analysis of

empirical data and national experience suggesting that judges believed that § 2G2.2 was already too severe in non-distribution cases, as evidenced by a 38% rate of downward departure. *See* 137 Cong. Rec. H6737 (Sept. 21, 1991). The Commission expressed concern that raising penalties even higher "may aggravate this below-guideline rate and heighten sentencing disparity." *Id.*

Today, below guideline sentences are imposed in 65.6% of cases sentenced under § 2G2.2, which includes hundreds of downward variances under § 3553(a) sponsored by the government. *See* U.S. Sent'g Comm'n, *2011 Sourcebook of Federal Sentencing Statistics*, tbl.28. While most judges do not follow § 2G2.2, others do, resulting in sentencing disparity.

Under the original guideline, Mr. Salinas' offense level would have been 12. With two levels off for acceptance of responsibility, *see* USSG § 3E1.1 (1991), his total offense level would have been 10. In Criminal History Category I, his guideline range would have been 6 to 12 months in Zone B. *See* USSG, App. C, amend. 372 (Nov. 1, 1991). And the guidelines would permit a sentence of five years' probation with six months of home confinement. USSG § 5C1.1(c)(3). Here, in order to take account of the extensive and compelling evidence that an extended term of imprisonment would be harsher than necessary in light of Mr. Salinas' age, family circumstances, low risk of recidivism, and likely successful efforts in therapy, Mr. Salinas asks this Court to impose a sentence of 48 months in custody and five years'

supervised release with conditions — a much greater loss of liberty than even the original guideline would require.

In declining to follow § 2G2.2 on policy grounds, this Court will be in good company. Seventy percent of district court judges believe that the guideline range for possession of child pornography is too severe. *See* U.S. Sent'g Comm'n, *Results of Survey of United States District Judges*, tbl.8 (2010).[20] And 83% believe that sentences other than straight imprisonment should be made more available under the guidelines for child pornography cases, whether probation (19%), probation with community or home confinement (23%), or a split sentence of incarceration with community or home confinement (41%). *Id.* tbl.11. As more fully set forth in Part II, *supra*, judges sentence below the guideline range recommended by § 2G2.2, sometimes far below, in the large majority of cases. Congress directed the Commission to take this data into account in reviewing and revising the guidelines, *see* 28 U.S.C. § 994(o), and it is in the process of attempting to do so. *See* U.S. Sent'g Comm'n, *History* at 1 nn.4, 8; *Child Porn Report* at ii, 322-23.

## CONCLUSION

For the reasons stated, Mr. Salinas respectfully requests that this Court grant his request for a downward departure or variance and impose the requested

---

[20] Available at
http://www.ussc.gov/Research/Research_Projects/Surveys/20100608_Judge_Survey.pdf.

sentence of 48 months in custody and five years of supervised release with the conditions that he register as a sex offender with the State of Texas, and undergo any further treatment deemed  necessary by the Probation Officer. Mr. Salinas additionally requests that he be granted any such further relief to which he may show himself justly entitled.

Respectfully submitted,

Abe Factor
TX SBN: 06768500
Factor, Campbell & Collins
Attorneys at Law
5719 Airport Freeway
Fort Worth, TX 76117
817-222-3333 (phone)
817-222-3330 (fax)
lawfactor@yahoo.com
Counsel for Defendant
Oscar Javier Salinas

## CERTIFICATE OF CONFERENCE

I hereby certify that a conference was (not) held on October 6, 2014, with counsel for the United States, and (I therefore assume) said counsel is opposed to the relief requested in this Motion.

Abe Factor

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served upon counsel for the United States, Aisha Saleem, by a manner compliant with the federal rules on October 7, 2014.

Abe Factor

# Appendix 1

# Professional Associates Counseling and Consultation center

1160 Country Club Ln., Ft. Worth, TX 76112 * (817) 496-9796 * Fax (817) 451-4104 * e-mail pacctx@flash.net

October 2, 2014

Client: Oscar Salinas

Referral Source: Abe Factor, Attorney

PSYCHOSEXUAL ASSESSMENT

Mr. Oscar Salinas was evaluated on October 1, 2014 for the purpose of assessing the severity of sexual dysfunction.

During clinical interview, this client acknowledged a history of interest and accessing pornographic images of children. He states that he first accessed child pornography at age 21, that the material is sexually arousing to him and that he does masturbate while viewing this material. He states that he also accesses adult pornography and has done so since age 13. He acknowledges his sexual attraction and fetish for underwear and states that he purchased underwear, both children and adult, via the internet. He acknowledges using these underwear during masturbation. He states that he does believe he has addiction to sex and pornographic material in general and believes he needs treatment to develop better to control of this behavior.

He denies ever communicating in sexual terms or images directly through email, chat or social networks with a minor. He denies any attempt to make direct physical contact with a minor for sexual purposes and denies any history of any type of direct, physical sexual contact with a minor. He also denies any intent or history of distribution of child pornography. He denies stealing underwear from any child or taking underwear that he may have found at the school where he worked.

Mr. Salinas denies any significant drug or alcohol abuse history. He denies any significant criminal history or involvement with law enforcement. He does acknowledge some shop lifting as a juvenile. He acknowledges being expelled from high school for 3 days for viewing pornography.

Results of the MCMI III psychological indicate the clinical syndrome of generalized anxiety disorder. His response patterns also suggest the existence of avoidant personality traits and borderline and narcissistic personality features. Based upon the measures of disclosure, this client appears to have been open and disclosing it his response to this instrument therefore the validity of this personality assessment is likely to be high. He does not exhibit severe personality pathology nor severe clinical syndromes. He does not exhibit evidence of high risk personality disorder.

The results of the Abel Assessment of Sexual Interest, psychophysiological measure of sexual

# Appendix 1

Salinas page 2

response patterns, indicates that this client has a heterosexual gender preference. His primary sexual attraction is to pre-pubescent females approximate age 6-13 and under 5 years. He does exhibit a secondary sexual response to adult females and physically mature adolescent females. His response to females under 13 is considered to be deviant and of serious concern.

Risk for future sexual offending was evaluated using the STATIC 99 and the STABLE 2007 risk assessment actuarial instruments. This client is best classified as a moderate risk for sexual re-offense which suggests a probability of 10-15%. With appropriate treatment, this probability can be reduced.

I recommend that this individual be evaluated by a physician to determine the benefits of psychotropic medication intervention focused on reduction of anxiety and reduction of arousal response. I also recommend that he participate in sex offender treatment and that he be closely supervised particularly with regard to internet use and around minors.

Deborah L. Moore LCSW, LPC, LSOTP

# Appendix 2
## Table 14

### LENGTH OF IMPRISONMENT FOR OFFENDERS IN EACH
### CRIMINAL HISTORY CATEGORY BY PRIMARY OFFENSE CATEGORY[1]
### Fiscal Year 2013

| | | | | CRIMINAL HISTORY CATEGORY | | | | | | | |
| | TOTAL | | | I | | | II | | | III | |
| PRIMARY OFFENSE | Mean Mths | Median Mths | N | Mean Mths | Median Mths | N | Mean Mths | Median Mths | N | Mean Mths | Median Mths | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TOTAL | 54 | 30 | 63,464 | 45 | 24 | 25,571 | 43 | 24 | 9,085 | 47 | 30 | 11,805 |
| Murder | 266 | 240 | 88 | 230 | 210 | 48 | 275 | 249 | 12 | 370 | 470 | 6 |
| Manslaughter | 61 | 40 | 61 | 47 | 30 | 37 | 67 | 44 | 12 | 64 | 57 | 5 |
| Kidnapping/Hostage Taking | 233 | 204 | 39 | 172 | 180 | 21 | 284 | 240 | 6 | 273 | 204 | 3 |
| Sexual Abuse | 138 | 120 | 406 | 122 | 120 | 258 | 128 | 120 | 57 | 147 | 120 | 40 |
| Assault | 41 | 30 | 563 | 25 | 21 | 214 | 31 | 24 | 80 | 40 | 26 | 88 |
| Robbery | 80 | 63 | 795 | 43 | 37 | 201 | 57 | 51 | 69 | 62 | 54 | 119 |
| Arson | 99 | 60 | 65 | 116 | 60 | 27 | 78 | 39 | 12 | 55 | 35 | 7 |
| Drugs - Trafficking | 76 | 60 | 20,526 | 56 | 41 | 9,961 | 73 | 60 | 2,556 | 82 | 60 | 3,172 |
| Drugs - Communication Facility | 41 | 41 | 316 | 35 | 36 | 125 | 41 | 43 | 58 | 40 | 36 | 41 |
| Drugs - Simple Possession | 7 | 5 | 53 | 4 | 5 | 12 | 4 | 2 | 7 | 5 | 3 | 14 |
| Firearms | 87 | 57 | 7,039 | 65 | 30 | 1,391 | 64 | 33 | 757 | 70 | 41 | 1,338 |
| Burglary/B&E | 19 | 12 | 29 | 9 | 7 | 17 | -- | -- | 1 | 22 | 23 | 6 |
| Auto Theft | 66 | 41 | 79 | 37 | 27 | 31 | 87 | 48 | 12 | 93 | 87 | 15 |
| Larceny | 20 | 12 | 459 | 18 | 12 | 267 | 19 | 15 | 43 | 16 | 8 | 59 |
| Fraud | 36 | 24 | 5,216 | 33 | 21 | 3,605 | 37 | 27 | 433 | 39 | 27 | 476 |
| Embezzlement | 21 | 15 | 165 | 21 | 15 | 140 | 24 | 8 | 8 | 16 | 12 | 7 |
| Forgery/Counterfeiting | 23 | 18 | 534 | 17 | 12 | 130 | 14 | 15 | 54 | 23 | 18 | 102 |
| Bribery | 29 | 21 | 168 | 27 | 20 | 148 | 33 | 28 | 7 | 44 | 32 | 8 |
| Tax | 21 | 16 | 372 | 19 | 13 | 318 | 24 | 21 | 34 | 35 | 19 | 13 |
| Money Laundering | 42 | 29 | 623 | 40 | 24 | 494 | 43 | 32 | 48 | 49 | 46 | 47 |
| Racketeering/Extortion | 94 | 60 | 772 | 70 | 41 | 314 | 85 | 51 | 85 | 97 | 63 | 128 |
| Gambling/Lottery | 10 | 9 | 31 | 8 | 6 | 19 | 13 | 12 | 7 | 17 | 16 | 3 |
| Civil Rights | 38 | 15 | 39 | 41 | 20 | 31 | 10 | 12 | 3 | 37 | 10 | 4 |
| Immigration | 18 | 12 | 20,901 | 8 | 4 | 5,421 | 15 | 9 | 4,338 | 19 | 14 | 5,569 |
| Child Pornography | 138 | 97 | 1,864 | 123 | 84 | 1,482 | 167 | 120 | 176 | 206 | 135 | 126 |
| Prison Offenses | 14 | 12 | 360 | 12 | 6 | 19 | 4 | 4 | 8 | 10 | 6 | 81 |
| Administration of Justice Offenses | 27 | 18 | 967 | 21 | 13 | 270 | 21 | 14 | 108 | 22 | 18 | 225 |
| Environmental/Wildlife | 14 | 6 | 31 | 12 | 6 | 22 | 13 | 15 | 3 | 10 | 6 | 3 |
| National Defense | 53 | 37 | 108 | 33 | 30 | 80 | 40 | 42 | 4 | 43 | 37 | 5 |
| Antitrust | 15 | 14 | 6 | 15 | 14 | 6 | -- | -- | 0 | -- | -- | 0 |
| Food & Drug | 16 | 12 | 24 | 15 | 12 | 18 | -- | -- | 1 | -- | -- | 2 |
| Other Miscellaneous Offenses | 47 | 18 | 765 | 35 | 15 | 444 | 59 | 23 | 86 | 56 | 24 | 93 |

[1] Of the 80,035 cases, the Commission received complete guideline application information for 71,004 cases. Of these, 7,463 with zero months of prison ordered were excluded. In addition, 77 cases were excluded due to missing or indeterminable sentencing information. The information in this table does not include any time of confinement as described in USSG §5C1.1. Descriptions of variables used in this table are provided in Appendix A.

# Appendix 2
### Table 14 (cont.)

**CRIMINAL HISTORY CATEGORY**

| PRIMARY OFFENSE | IV | | | V | | | VI (non-career offender) | | | VI (career offender) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Mean Mths | Median Mths | N | Mean Mths | Median Mths | N | Mean Mths | Median Mths | N | Mean Mths | Median Mths | N |
| TOTAL | 54 | 37 | 6,702 | 66 | 46 | 3,865 | 83 | 60 | 4,184 | 159 | 144 | 2,252 |
| Murder | 272 | 251 | 6 | 393 | 470 | 3 | 261 | 240 | 9 | 416 | 470 | 4 |
| Manslaughter | 47 | 48 | 3 | 88 | 70 | 3 | -- | -- | 0 | -- | -- | 1 |
| Kidnapping/Hostage Taking | 375 | 360 | 7 | -- | -- | 0 | -- | -- | 2 | -- | -- | 0 |
| Sexual Abuse | 203 | 198 | 21 | 222 | 215 | 18 | 165 | 120 | 7 | 438 | 470 | 5 |
| Assault | 47 | 37 | 67 | 47 | 28 | 20 | 54 | 41 | 39 | 96 | 77 | 55 |
| Robbery | 72 | 70 | 104 | 77 | 70 | 58 | 94 | 90 | 93 | 150 | 151 | 151 |
| Arson | 54 | 60 | 5 | 114 | 105 | 5 | 150 | 104 | 5 | 93 | 90 | 4 |
| Drugs - Trafficking | 88 | 70 | 1,539 | 105 | 88 | 840 | 111 | 93 | 808 | 151 | 140 | 1,650 |
| Drugs - Communication Facility | 37 | 39 | 22 | 50 | 48 | 19 | 48 | 48 | 17 | 55 | 48 | 34 |
| Drugs - Simple Possession | 9 | 7 | 9 | -- | -- | 2 | 7 | 5 | 8 | -- | -- | 1 |
| Firearms | 80 | 57 | 1,132 | 88 | 66 | 811 | 115 | 92 | 1,361 | 248 | 211 | 249 |
| Burglary/B&E | 20 | 21 | 3 | -- | -- | 0 | -- | -- | 1 | -- | -- | 1 |
| Auto Theft | 101 | 78 | 5 | 83 | 76 | 8 | 43 | 41 | 7 | -- | -- | 1 |
| Larceny | 25 | 15 | 29 | 37 | 27 | 28 | 29 | 23 | 33 | -- | -- | 0 |
| Fraud | 45 | 32 | 254 | 51 | 37 | 163 | 56 | 48 | 283 | -- | -- | 2 |
| Embezzlement | 22 | 9 | 6 | -- | -- | 1 | 33 | 24 | 3 | -- | -- | 0 |
| Forgery/Counterfeiting | 20 | 18 | 89 | 31 | 24 | 54 | 36 | 32 | 105 | -- | -- | 0 |
| Bribery | 34 | 20 | 4 | -- | -- | 0 | -- | -- | 0 | -- | -- | 1 |
| Tax | 18 | 16 | 4 | -- | -- | 1 | -- | -- | 2 | -- | -- | 0 |
| Money Laundering | 64 | 68 | 22 | 66 | 48 | 4 | 77 | 51 | 8 | -- | -- | 0 |
| Racketeering/Extortion | 101 | 78 | 65 | 124 | 96 | 52 | 128 | 114 | 56 | 149 | 145 | 72 |
| Gambling/Lottery | -- | -- | 2 | -- | -- | 0 | -- | -- | 0 | -- | -- | 0 |
| Civil Rights | -- | -- | 0 | -- | -- | 0 | -- | -- | 0 | -- | -- | 1 |
| Immigration | 26 | 20 | 2,994 | 32 | 25 | 1,543 | 37 | 30 | 1,036 | -- | -- | 0 |
| Child Pornography | 189 | 128 | 46 | 412 | 360 | 23 | 224 | 222 | 10 | -- | -- | 1 |
| Prison Offenses | 11 | 10 | 79 | 15 | 13 | 68 | 20 | 15 | 96 | 30 | 33 | 9 |
| Administration of Justice Offenses | 25 | 21 | 133 | 29 | 30 | 107 | 51 | 33 | 122 | -- | -- | 2 |
| Environmental/Wildlife | -- | -- | 1 | -- | -- | 1 | -- | -- | 1 | -- | -- | 0 |
| National Defense | -- | -- | 1 | -- | -- | 0 | 149 | 118 | 18 | -- | -- | 0 |
| Antitrust | -- | -- | 0 | -- | -- | 0 | -- | -- | 0 | -- | -- | 0 |
| Food & Drug | 32 | 30 | 3 | -- | -- | 0 | -- | -- | 0 | -- | -- | 0 |
| Other Miscellaneous Offenses | 54 | 24 | 47 | 77 | 33 | 33 | 80 | 37 | 54 | 82 | 69 | 8 |

SOURCE: U.S. Sentencing Commission, 2013 Datafile, USSCFY13.

APPENDIX 3
# HISTORY OF THE CHILD PORNOGRAPHY GUIDELINE AS APPLICABLE IN THIS CASE

Before 1990, possession of child pornography was not a crime, and those convicted of knowingly distributing or receiving child pornography were sentenced under USSG § 2G2.2. After possession was made a crime in 1990, defendants convicted of possession were sentenced under USSG § 2G2.4. In 2004, USSG § 2G2.2 and § 2G2.4 were consolidated.

The following sets forth, in chronological order, the changes to § 2G2.2 and § 2G2.4 that have affected the guideline range in this case, as made by both Congress and the Commission, and the reasons given for them.

**1990: The Commission added an enhancement to § 2G2.2 for material depicting sadistic or masochistic conduct.**

When § 2G2.2 was first promulgated, it applied only to trafficking offenses and did not include an enhancement for materials involving sadistic or masochistic conduct. *See* USSG § 2G2.2 (1987). The guideline for offenses involving adult obscenity in federal jurisdictions, § 2G3.1, did have such an enhancement, adding four levels to a base offense level of 6. *See* USSG § 2G3.1 (1987). In June 1989, the Commission proposed eliminating the enhancement in adult obscenity cases, *see* 54 Fed. Reg. 24,073 (June 5, 1990), but ultimately decided against it because the Department of Justice was "strongly opposed." U.S. Sent'g Comm'n, *Working Group on Child Pornography and Obscenity Offenses and Hate Crime* 42, 45(1990).[1] The Department provided no empirical reason for retaining the enhancement under § 2G3.1. *See* Letter from Stephen A. Saltzburg, Deputy Asst. Att'y Gen., to William W. Wilkins, Jr., Chair, U.S. Sent'g Comm'n, at 9 (June 30, 1989).[2]

Just months after it had considered eliminating the enhancement under § 2G3.1, the Commission proposed adding a 4-level enhancement to § 2G2.2 "if the offense material involved material that portrays sadistic or masochistic conduct or other depictions of violence." 55 Fed. Reg. 5718 (Feb. 16, 1990). It did not give any reason. *Id.* This proposal was part of a package of proposed changes to § 2G2.2, including an increase to the base offense level for distribution from 13 to 15. In its proposed Reason for Amendment, the Commission said that the change to the base offense level was to "better reflect the severity of more grievous offenses." *Id.*

Formal public comment was largely critical of the amendment as a whole, pointing out in particular that the Commission had provided no empirical support for it and that it would result in sentences more severe in certain cases than for some robberies. *See, e.g.*, Statement of Paul D. Borman, on Behalf of the Federal Defenders, to the U.S. Sent'g Comm'n (Mar. 15, 1990);

---

[1] Available at http://www.src-project.org/wp-content/uploads/2009/08/ussc_report_child_obsc_hate_19900116.pdf.

[2] Available at http://www.src-project.org/wp-content/pdfs/public-omment/ussc_publiccomment_198907/0006077.pdf.

1

Statement of Samuel J. Buffone on Behalf of the American Bar Association Before the U.S. Sent'g Comm'n (Mar. 1990).[3] Even Citizens for Decency through Law, one of the citizens' organizations that supported higher penalties in general, objected that the Commission had no basis for deciding that sadistic or masochistic images are "more heinous than other forms of obscenity." *See* Letter from Benjamin W. Bull, Citizens for Decency through Law, at 2-3 (Apr. 6, 1990 ("All obscenity is heinous. . . . [T]here is an unnecessary and unwarranted increase in levels if the material is sado-masochistic."). The Commission also received "informal input from individual judges" indicating their view that, contrary to the proposed amendments, defendants with no significant criminal history or "future likelihood of acting out should receive straight probationary periods." U.S. Sent'g Comm'n, *The History of the Child Pornography Guidelines* 16 (2009) ["U.S. Sent'g Comm'n, *History*"].

In the end, the Commission added the 4-level enhancement for materials depicting sadistic and masochistic conduct to § 2G2.2, but did not increase the base offense level. USSG, App. C, amend. 325 (Nov. 1, 1990). It did not provide any reason for the enhancement. *See id.* (Reason for Amendment) (saying only that the amendment "provided a specific offense characteristic for materials involving depictions of sadistic or masochistic conduct or other violence").

In its 2009 account of the history of the child pornography guidelines, the Commission said that the enhancement under § 2G2.2 was "included because it mirrored the specific offense characteristic already available under the distribution of adult obscenity guideline and thereby accorded consistent treatment of such material under both guidelines." U.S. Sent'g Comm'n, *History* at 15 n.68. It also noted that in March 1987, before the promulgation of the initial set of guidelines, the Department of Justice "had recommended [for § 2G2.2] a 10-level increase to a base offense level of 13 for sadistic and masochistic images." *Id.* It did not mention that the Commission itself had proposed eliminating the enhancement, but had not done so at the Department's behest.

As described below, when Congress added the same enhancement to § 2G2.4 in 2003 for possession offenses, it simply mirrored the enhancement under § 2G2.2.

**1991:   The Commission promulgated a new guideline at § 2G2.4 in response to the criminalization of simple possession of child pornography.**

In 1990, Congress made it a crime to possess "3 or more books, magazines, periodicals, films, video tapes, or other matter which contain any visual depiction" of a minor engaging in sexually explicit conduct, with a statutory maximum of five years. Crime Control Act of 1990, Pub. L. No. 101-647, § 323(a) (1990). Congress did not direct the Commission to respond in any particular or general manner. In support of making simple possession a crime, Senator Thurmond expressed the belief that "[t]hose who possess and view this material comprise the market for this underground industry," 136 Cong. Rec. S4730 (Apr. 20, 1990), and that "[t]ough

---

[3] Available at /www.src-project.org/wp-content/pdfs/public-comment/ussc_publiccomment_amend_1990/0000423.pdf.

penalties for the possession, viewing, and dissemination of this material will be a deterrent to those who would sexually exploit children." 136 Cong. Rec. S9029 (June 28, 1990)

At the time, the base offense level for trafficking and receipt was 13. USSG § 2G2.2 (1990). The Commission responded to the new offense of simple possession by creating a new guideline, USSG § 2G2.4, to "address offenses involving receipt or possession of materials depicting a minor engaged in sexually explicit conduct, as distinguished from offenses involving trafficking in such material, which continue to be covered under § 2G2.2." *See* USSG, App. C, amend. 372 (Nov. 1, 1991). The Commission chose to set the base offense level for simple receipt and possession at 10, three levels lower than the base offense level for trafficking. *See id.* It included a cross-reference to § 2G2.2 for "[o]ffenses involving receipt or transportation of [child pornography] for the purpose of trafficking." *Id.*

The Commission included only one enhancement, for material that "involved a prepubescent minor or a minor under the age of twelve years." *Id.*; USSG § 2G2.4 (1991). This enhancement was taken from the same enhancement already present in § 2G2.2. When § 2G2.2 was initially promulgated in 1987, the enhancement applied only if the material involved a minor under the age of twelve, *see* USSG § 2G2.2 (1987), but the Commission chose to amend it the next year to add "prepubescent minor" as "an alternative measure to be used in determining whether the material involved an extremely young minor for cases in which the actual age of the minor is unknown." USSG, App. C, amend. 31 (June 15, 1988). The Commission did not provide a reason for this change.

**1991: The Commission increased the base offense level under § 2G2.4 from 10 to 13 in response to a specific congressional directive.**

Before the new guideline at § 2G2.4 went into effect, Senator Jesse Helms introduced an amendment to the Treasury-Postal Service Appropriations Bill of 1991 that would direct the Commission to restore receipt offenses to the guideline for trafficking, § 2G2.2, increase the base offense level under § 2G2.2 to 15, and increase the base offense level for simple possession under § 2G2.4 to 13. *See* 137 Cong. Rec. S10322 (July 18, 1991). Senator Helms primarily complained (incorrectly) that the Commission had "reduced" penalties for receipt offenses, and said that a base offense level of 10 for possession and receipt "is just too low, because the defendant usually gets probation or home confinement." *Id.* at S10323. He referred to "pedophiles," "smut peddlers," and those "dealing in child pornography." *Id.* He expressed the belief that "we must increase the sentencing levels for child porn if we want to stop child molestations and put a dent in the child porn trade." *Id.* As proof that "child pornography plays a central role in child molestations by pedophiles" and is "directly connected to child molestation," *id.* at S10323, Senator Helms placed in the record a 1986 Senate Report on child pornography and pedophilia, *id.* at S10325-28.

In that report, the Senate Permanent Subcommittee on Investigations on Child Pornography and Pedophilia found that "no single characteristic of pedophilia is more pervasive than the obsession with child pornography." S. Rep. No. 99-537, at 9 (1986). It found that pedophiles possess and collect child pornography for seven primary reasons: (1) to justify and validate the sexual abuse of children; (2) to stimulate sexual drive as a prelude to the sexual

3

abuse of a child; (3) to lower a child's inhibitions in order to sexually abuse the child; (4) to preserve the child's youth at the age of sexual preference; (5) to blackmail victims; (6) as a medium of exchange to gain access to more children; and (7) for profit. *Id.* at 10-12. Notably, the report found that there was "no need" for major revisions to the law, as the laws "now on the books are well designed and are reaping impressive gains" by providing a new incentive, in the form of a ten-year statutory maximum, for the investigation and prosecution of those who produce and traffic in child pornography. *Id.* at 45. Its only suggestion was that Congress ban advertising of child pornography. *Id.*

Senator Helms' amendment was adopted by the Senate without debate. 137 Cong. Rec. S10363 (July 18, 1991).

On September 21, 1991, the Chair of the Sentencing Commission wrote a letter to the House of Representatives to object to the characterization of it decision in the Senate, and to more fully explain its reasons for choosing to treat receipt offenses the same as possession and to set the base offense level for both at 10. *See* 137 Cong. Rec. H6736-37 (Sept. 21, 1991). It explained that a base level of 10 was "the highest of the alternatives proposed for public comment," and "is roughly 50 percent greater" than the base offense level for receipt and possession with intent to distribute adult obscenity in federal jurisdictions. *Id.* at H6737. The letter explained that "empirical data in non-distribution cases sentenced under §2G2.2 during fiscal year 1990 suggest[ed] many judges" believed the guidelines in such cases were too severe, as evidenced by a 38% rate of downward departures, more than double the overall rate of downward departure. It expressed a concern that raising penalties even higher "may aggravate this below-guideline rate and heighten sentencing disparity." *Id.* It said that the proposed directive "will reintroduce the very problems the guidelines now prevent." *Id.*

In support of its passage in the House, Representative Wolf described the measure as providing "increased protection for children who are the victims of molestation and exploitation," and said that "Congress wants to put teeth into the criminal laws governing child pornography." 137 Cong. Rec. H6736 (Sept. 24, 1991). He stated that the existence of a record of sexual abuse, "and its potential circulation through national, and in some instances even international, chains of distribution can serve only to deepen the emotional and psychological wounds of the child victim." *Id.* at H6738. He also referred to the 1986 Senate Report, and stated that "[m]ost experts agree that there is a very high degree of correlation between those who desire to receive and possess child pornography and those who engage in the sexual molestation of young children." *Id* He said that "those who receive child pornography through the mails are often also involved in the actual sexual abuse of children--or at the very least meet the psychological profile of those likely to engage in molesting children." *Id.* He dismissed the Commission's objections. *Id.* at H6739.

The directive was passed by the House, and became law on October 28, 1991. Congress directed the Commission to move receipt offenses back to § 2G2.2, and "to promulgate guidelines, or amend § 2G2.4 to provide a base offense level of not less than 13" for simple possession offenses. Treasury, Postal Service and General Government Appropriations Act, 1992, Pub. L. No. 102-141, § 632(1)(C) (1991). The Commission did as it was told, raising the

base offense level for possession from 10 to 13, and the base offense level for trafficking and receipt from 13 to 15.  USSG, App. C, amend. 436 (Nov. 27, 1991).

**1991:  The Commission added a 2-level enhancement under § 2G2.4 for "10 or more items" in response to a specific congressional directive.**

When Congress directed the Commission to increase the base offense level from 10 to 13, it also directed the Commission to "provide at least a 2 level increase for possessing 10 or more books, magazines, periodicals, films, video tapes or other items containing a visual depiction involving the sexual exploitation of a minor."  Treasury, Postal Service and General Government Appropriations Act, 1992, Pub. L. No. 102-141, § 632(1)(C) (1991).

The floor discussions (described above) do not reveal any particular justification for this directive.

**1996:  The Commission increased the base offense level from 13 to 15 under § 2G2.4 in response to a specific congressional directive.**

In 1995, Congress directed the Commission to (1) increase the base offense level for an offense under [18 U.S.C. § 2251, criminalizing production] by at least 2 levels; and (2) increase the base offense level for an offense under [18 U.S.C. § 2252, criminalizing trafficking and possession] by at least 2 levels."  Sex Crimes Against Children Prevention Act of 1995, Pub. L. No. 104-71, § 2 (1995).

When the measure was initially passed by the House, it instructed the Commission to increase punishment only for those who produce and distribute child pornography, 141 Cong. Rec. H4122 (Apr. 4, 1995).  As a result, the discussion in the House centered on production, distribution, and advertising offenses, *id.* at H4122-24, and thus reveals no reason for the directive with respect to simple possession.  In the Senate, the measure was broadened to cover all child pornography offenses, but the discussion still centered on "predatory pedophiles [who] sell, purchase and swap the most vile depictions of children engaged in the most outrageous types of sexual conduct."  141 Cong. Rec. S5509 (Apr. 6, 1995) (Sen. Grassley).  Senator Hatch said that "persons who choose to engage in sexual exploitation of children, whether to satisfy prurient desire or to gain filthy lucre, must be made to feel the full weight of the law and suffer a punishment commensurate with the seriousness of their offense."  *Id.*

In response to this directive, the Commission increased the base offense level for possession offenses under § 2G2.4 from 13 to 15, and increased the base offense level for trafficking and receipt from 15 to 17.  USSG, App. C, amend. No. 537 (Nov. 1, 1996).

**1996:  The Commission added a 2-level enhancement under § 2G2.4 for possession resulting from the defendant's use of a computer in response to a specific congressional directive.**

As part of the 1995 law directing the Commission to increase base offense levels, Congress directed the Commission to "amend the sentencing guidelines to increase the base

offense level by at least 2 levels for an offense committed under section 2251(c)(1)(A) [at the time, criminalizing advertising for child pornography or for participation in conduct for the purpose of producing child pornography] or 2252(a) of title 18 [criminalizing trafficking and possession], United States Code, if a computer was used to transmit the notice or advertisement to the intended recipient or to transport or ship the visual depiction." Sex Crimes Against Children Prevention Act of 1995, Pub. L. No. 104-71, § 3 (1995).

When the measure was initially passed by the House, it did not apply to simple possession offenses. 141 Cong. Rec. H4122 (Sept. 24, 1995). In the Senate, the measure was broadened to cover simple possession offenses, but no reason was given for the change and discussion focused, as it did in the House, on producers and distributors. Regarding this directive in particular, Senator Hatch said that "this legislation helps our law enforcement efforts in this area keep pace with changing technology by increasing the penalties for the use of computers in connection with *the distribution* of child pornography. . . . It is critical that we act to ensure that [the information super] highway is not littered with the debris of child pornography." 141 Cong. Rec. S5509 (Apr. 6, 1995) (emphasis added). Senator Grassley said that the amendment was "to discourage child pornographers from using computers *to trade in* child pornography." *Id.* (emphasis added). There is no evidence of congressional purpose with regard to simple possession.

The Commission implemented the directive by adding a two-level enhancement to § 2G2.2 if "a computer was used" to solicit a minor to participate in the production of sexually explicit material, or for transmission or notice or advertisement of the material. USSG, App. C, amend. 537 (Nov. 1, 1996). Using slightly different language, it added a two-level enhancement to § 2G2.4 "if the defendant's possession of the material resulted from the defendant's use of a computer." *Id.* The Commission said simply that the amendment implemented the directive. *Id.*

In its report to Congress, submitted also in response to a directive, the Commission noted that approximately one-third of defendants sentenced for possession under § 2G2.4 used a computer to store or receive the images. U.S. Sent'g Comm'n, *Report to the Congress: Sex Offenses Against Children* 29 (1996). The Commission was unable to discern a particular congressional motive for the directive, and strongly suggested that the "use of a computer" enhancement as Congress directed applied too broadly without making appropriate distinctions in culpability:

> Not all computer use is equal. Some uses lead to more widespread dissemination of child pornography and to increased accessibility of pornography and other sexually explicit dialogue to children. Sentencing policy should be sensitive to these differences in culpability so that punishments are tailored to fit the circumstances of each individual's crime.
>
> . . .
>
> Federal cases to date typically do not involve the type of computer use that would result in either wide dissemination or a likelihood that the material will be viewed by children.
>
> . . .

6

The adjustment does not distinguish between persons who e-mail images to a single voluntary recipient and those who establish a BBS and distribute child pornography to large numbers of subscribers.

Congress and the Commission may wish to develop a more finely-tuned system of apportioning punishment in cases involving the use of computers. For example, an upward departure might be recommended in cases in which a computer was used to widely disseminate pornography, or in which pornography was made accessible to children. Alternatively, the two level adjustment might be narrowed to apply only to cases that involve distributing child pornography in a way that makes it widely accessible, such as posting it on a BBS or Website.

*See id.* 28-30 & n.23. Thus, according to the Commission, the use of a computer might appropriately be considered an aggravating factor only when a computer was used to widely disseminate pornography or to make it accessible to children.

## 2000: The Commission expanded the "distribution" enhancement under § 2G2.2 in response to a specific congressional directive.

In 1998, Congress directed the Commission to "review the Federal Sentencing Guidelines relating to the distribution of pornography covered under chapter 110 of title 18," and to "clarify that the term 'distribution of pornography'" applies to distribution both "for monetary remuneration" and "for a nonpecuniary interest." Protection of Children from Sexual Predators Act of 1998, Pub. L. No. 105-314, title V, § 506 (1998). At the time, § 2G2.2 included a minimum 5-level enhancement, based on the loss table in former §2F1.1 (Fraud), if the offense involved "distribution." USSG § 2G2.2 (1998). "Distribution" was defined as an "act related to distribution for pecuniary gain, including production, transportation, and possession with intent to distribute." *Id.* § 2G2.2 cmt. (n.1).

Senator Hatch suggested that the bill generally, which contained numerous provisions relating to transportation offenses, production of child pornography, and sexual abuse, was aimed at deterring child molesters who use pornography to stalk and groom children: The bill "provide[s] additional protection for our children [] [b]y prohibiting the libidinous dissemination on the Internet of information related to minors and the sending of obscene material to minors, we make it more difficult for sexual predators to gather information on, and lower the sexual inhibitions of, potential targets." 144 Cong. Rec. S12262 (Oct. 9, 1998) (Senator Hatch). He said that "those who take the path of predation should know that the consequences of their actions will be severe and unforgiving." *Id.*

In the House, the discussion similarly centered on abductions and predators. 144 Cong. Rec. H10566-75 (Oct. 12, 1998). Representative Hastings said that the bill "is a comprehensive response to the horrifying menace of sex crimes against children, particularly assaults facilitated by computers," and "principally[] target[s] pedophiles who stalk children on the Internet and by cracking down on pedophiles who use and distribute child pornography to lure children into sexual encounters." *Id.* at H10571-72.

In response to the directive, the Commission amended § 2G2.2 to define "distribution" to mean "any act, including production, transportation, and possession with intent to distribute" regardless of whether the distribution was related to pecuniary gain. USSG, App. C, amend. 592 (Nov. 1, 2000). It provided varying levels of enhancement depending on the purpose and recipient of the distribution: distribution for pecuniary gain (at least 5 levels); distribution for the receipt of a "thing of value" other than pecuniary gain (5 levels); distribution to a minor (5 levels); and distribution to a minor intended to persuade or entice the minor to engage in sexual activity (7 levels). *Id.* It also added a 2-level catch-all for distribution "other than distribution as described" above, *i.e.*, that is not for pecuniary gain or "thing of value," or to a minor. *Id.*

The Commission explained in its Reason for Amendment that "these varying levels are intended to respond to increased congressional concerns, as indicated in the legislative history of the Act, that pedophiles, including those who use the Internet, are using child pornographic and obscene material to desensitize children to sexual activity, to convince children that sexual activity involving children is normal, and to entice children to engage in sexual activity." *Id.* It did not explain how these concerns support the catch-all provision, which applies to distribution for none of those purposes.

In addition, as the enhancement is worded, it does not contain any *mens rea* requirement. At the time, however, those sentenced under § 2G2.2 would have been convicted of a trafficking offense, with its attendant *mens rea* requirement. There was no distribution enhancement under § 2G2.4 for possession, but if the cross-reference to § 2G2.2 was applied, the judge would have found the defendant committed a trafficking offense with its attendant *mens rea* requirement. *See, e.g., United States v. Sromalski*, 318 F.3d 748, 752-53 (7th Cir. 2003). As described below, the reach of this enhancement was expanded in 2004 when the Commission chose to consolidate § 2G2.4 with § 2G2.2, USSG, App. C, amend. 664 (Nov. 1, 2004), with the result that the distribution enhancement would apply on a strict liability basis in simple possession cases. The Commission did not explain or acknowledge that those convicted of simple possession would be subject to the enhancement without a *mens rea* requirement.

## 2003: Congress directly amended § 2G2.4 to add "number of images" table and 4-level enhancement for materials involving sadistic or masochistic conduct.

As part of the PROTECT Act, Congress amended § 2G2.2 and § 2G2.4 by adding the "number of images" table, as follows:

If the offense involved—
    (A) at least 10 images, but fewer than 150, increase by 2 levels;
    (B) at least 150 images, but fewer than 300, increase by 3 levels;
    (C) at least 300 images, but fewer than 600, increase by 4 levels; and
    (D) 600 or more images, increase by 5 levels.

PROTECT Act, Pub. L. No. 108-21, title IV, § 401(i)(1)(B) & (C) (2003). The Commission incorporated the enhancements as written. USSG, App. C, amend. 649 (Apr. 30, 2003). The

result under § 2G2.4 was that there was an enhancement for "10 or more items" *and* for the number of images.

Also as part of the PROTECT Act, Congress directly added a 4-level enhancement to § 2G2.4 "if the offense involved material that portrays sadistic or masochistic conduct or other depictions of violence." Pub. L. No. 108-21, § 401(i)(B) (2003). This simply mirrored the enhancement already present in § 2G2.2, which in turn mirrored the enhancement in the adult obscenity guideline.

These enhancements were part of the Feeney Amendment. *See* 149 Cong. Rec. H2420 (Mar. 27, 2003). No reason was given for them in the conference report on the PROTECT Act, H.R. Rep. No. 108-66, at 58-59 (2003) (Conf. Rep.), which reported on the Feeney Amendment. Nor was there any particular reason stated in floor discussions in the House or the Senate. In a letter urging passage of the amendment, the Department of Justice wrote that "[t]he current Sentencing Guidelines fail adequately to account for the volume of the material, with the result that an offender who sent one image of child pornography over the Internet receives the same treatment under the Guidelines as an offender who set up a website containing thousands of images." 149 Cong. Rec. S5128 (Apr. 10, 2003). It did not attempt to justify the enhancement in cases involving simple possession or mention the enhancement for sadistic or masochistic conduct.

Though there was no discussion of these enhancements, there was extensive discussion of other provisions of the PROTECT Act, which contained numerous other provisions relating to child abductions, child sexual abuse, and child pornography. The child pornography provisions in S. 151 as they existed before the Feeney Amendment were aimed at eliminating the "virtual porn" defense created by *Ashcroft v. Free Speech Coalition*, 122 S. Ct. 1389 (2002), and adding new crimes of pandering or solicitation of child pornography and using child pornography to persuade a minor to engage in an illegal act. *See* S. Rep. No. 108-2 (2003). The stated purpose of S. 151 in February 2003 was to "restore the government's ability to prosecute child pornography offenses successfully." *Id.* at 1. As background, the Senate report repeated earlier reports that "child pornography stimulates the sexual appetites and encourages the activities of child molesters and pedophiles, who use it to feed their sexual fantasies," and that "[c]hild molesters and pedophiles use child pornography to convince potential victims that the depicted sexual activity is normal practice; that other children regularly participate in sexual activities with adults or peers." S. Rep. No. 108-2, at 3 (2003).

When the bill returned to the Senate later in the year—now greatly expanded to include, among other things, the Amber Alert Act, the Code Adam Act, provisions relating to child abductions and kidnapping, and including a compromise version of the Feeney Amendment— Senator Hatch began his general comments by identifying "three distinct harms" of child pornography "long recognized" by Congress: (1) it "whets the appetites of pedophiles and prompts them to act out their perverse sexual fantasies"; (2) "it is a tool used by pedophiles to break down the inhibitions of children"; and (3) it "creates immeasurable and indelible harm on the children who are abused to manufacture it." 149 Cong. Rec. S5114 (Apr. 10, 2003).

9

Senator Hatch justified the Feeney Amendment's restrictions on departures in child sex cases by referring to "pedophiles, molesters, and pornographers," "vicious defendants," and "child rapists." *Id.* at S5115, S5122. As an example of the target of the Feeney Amendment's "sentencing reforms," he described a defendant convicted of possessing images involving violence and sadism, and who was "engaging in online communication with a 15-year-old girl." *Id.* at S5115. In further support of the Feeney Amendment, he emphasized "a disturbing fact about child pornographers" and pointed to a study done by the Bureau of Prisons (often referred to as the 2000 Butner Study) that "shows that 76 percent of child pornographers and those who had been convicted of traveling in interstate commerce to commit sex acts with minors admitted to undetected sex crimes with an average of 30.5 child sex victims." *Id.* at S5126.[4] Aside from these general statements regarding the departure provisions in the Feeney Amendment, neither Senator Hatch nor any other Senator addressed or justified the "number of images" table contained in the Feeney Amendment or explained what purpose it is meant to serve in simple possession cases, or in any case.

## 2004: The Commission consolidated § 2G2.2 and § 2G2.4 to subject simple possession to a strict liability distribution enhancement.

In 2004, the Commission decided to consolidate § 2G2.2 and § 2G2.4. *See* USSG, App. C, amend. 664 (Nov. 1, 2004). It said that it did so to "address[] concerns raised by judges, probation officers, prosecutors, and defense attorneys regarding difficulties in determining the appropriate guideline [] for cases involving convictions of 18 U.S.C. § 2252 or § 2252A," and because, "as a result of amendments directed by the PROTECT Act, these guidelines have a number of similar specific offense characteristics." *Id.* Section 2G2.2 contained the same enhancements for material involving a prepubescent minor, use of a computer, sadistic and masochistic conduct, and number of images. However, as a result of the amendment, defendants convicted only of simple possession and whose offense did not involve trafficking (with its attendant *mens rea* requirement of "knowingly" engaging in the trafficking offense conduct), would be subject to the distribution enhancement, which has no *mens rea* requirement and which, as described above, was driven by congressional concerns that pedophiles distribute pornography to children in order to desensitize them to sexual activity and to entice or coerce them to engage in sexual activity, circumstances that are not present here. The Commission did not explain or acknowledge this result.

## 2004: The Commission increased the base offense level under § 2G2.2 from 15 to 18 in response to an increase in the statutory maximum and to link it to the mandatory minimum for trafficking and receipt.

As part of the PROTECT Act, Congress established five-year mandatory minimum penalties for trafficking and receipt offenses, and increased the statutory maximum for simple possession from 5 to 10 years. PROTECT Act, Pub. L. No. 108-21, title IV, § 103(a) (2003). When the Commission consolidated § 2G2.4 with § 2G2.2, it increased the base offense level for possession from 15 to 18, and increased the base offense level for receipt and distribution from

---

[4] As shown in the body of this Memorandum, the Butner study has since been thoroughly discredited. *See* Part I.A.1 n.3.

17 to 22. USSG, App. C, amend. 664 (Nov. 1, 2004). The Commission explained that it chose a base offense level for trafficking offenses that would result in a sentence that "reach[es] or exceed[s]" the mandatory minimum in nearly every case, considering the enhancements that apply in nearly every case, and that it increased the base offense level for possession offenses "because of the increase in the statutory maximum term of imprisonment from 5 to 10 years, and to maintain proportionality with receipt and trafficking offenses." *Id.*; U.S. Sent'g Comm'n, *History* at 44-46.

In 2011, the Commission acknowledged that the mandatory minimums, to which the possession guideline is structurally tied, "may be excessively severe." U.S. Sent'g Comm'n, *Report to the Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System*, 365 (2011). It noted that 71% of judges surveyed "state that the mandatory minimum penalty for receipt of child pornography is too high," *id.* at 365, and that prosecutorial charging practices suggest that prosecutors also believe that mandatory minimum penalties for certain offenses are too high. *Id.*

### 2004: The Commission instructed that each video or video clip is to be counted as 75 images.

Also in 2004, the Commission instructed in new commentary that "[e]ach photograph, picture, computer, or computer-generated image, or any similar visual depiction shall be considered to be one image." USSG, App. C, amend. 664 (Nov. 1, 2004); USSG § 2G2.2 cmt. (n.4(B)(ii)). The Commission instructed that each "video, video-clip, movie, or similar recording shall be considered to have 75 images." *Id.*

At the time of the amendment, the Commission did not explain why it assigned 75 images to each video or video clip. USSG, App. C, amend. 664 (Nov. 1, 2004) (Reason for Amendment). In its subsequent *2010 History*, it said that the Department of Justice took the position that videos should be treated as more than one image and suggested that each video be subject to a 2- or 3- level enhancement. The Commission accepted that position, and selected 75 images because it is "squarely in the middle of the 2-level increase range" directed by Congress for between 10 and 150 images. U.S. Sent'g Comm'n, *History* at 43-44. In other words, the Commission's choice to use 75 images for each video was tied to Congress's number of images table, which was adopted without explanation or justification, much less an empirical justification. There was no suggestion by the Department of Justice, and no finding by the Commission, that persons who possess videos as opposed to still images are more culpable or present a greater risk of harm.

# Appendix 4

## Placement of Sentences Under U.S.S.G. § 2G2.2 – FY 2011

The tables on the following pages show the number and percentages of defendants receiving various types of sentences under U.S.S.G. §2G2.2. The first two tables show placement relative to the guideline range for defendants 1) in all criminal history categories (CHC) combined, and 2) in each criminal history category separately.  Note that over 82% of defendants sentenced under this guideline are in CHCI, and that the majority of defendants in CHCI receive a sentence below the guideline range that was not sponsored by the government.

The next set of tables indicates placement within the range for offenders within CHCI who also receive some of the most common upward specific offense level adjustments under the guideline.  Statistics available at the Commission's website indicate that the adjustments under (b)(2) (victim under the age of 12), (b)(4) (sadomasochistic or violent content), (b)(6) (use of a computer), and (b)(7)(D) (600 images or over), are applied in the vast majority of cases sentenced under the guideline. (Data available at: http://www.ussc.gov/Data_and_Statistics/Federal_Sentencing_Statistics/Guideline_Application_Frequencies/2011/Use_of_Guidelines_and_Specific_Offense_Characteristics.pdf) These defendants receive non-government sponsored sentences below the guideline range at an even higher rate than other CHCI defendants.  As judges and courts of appeals frequently find, these enhancements significantly increase the guideline range, apply in almost every case, and fail to distinguish between more and less culpable offenders.

The final tables show the number of defendants receiving various lengths of prison terms, including sentences that do not include a term of imprisonment. (Some of these sentences may have included alternative confinement, such as home confinement, as a condition of probation.) Tables are presented for defendants in each Criminal History Category, and for defendants in CHCI who receive various final offense levels.  These data show that, while in FY2011 no defendants in a CHC greater than category I received sentences without imprisonment, some CHCI defendants with offense levels as high as 36 did receive sentences without imprisonment.

The data shown in these tables were extracted from the U.S. Sentencing Commission's 2011 Monitoring Dataset by Paul J. Hofer, Policy Analyst, Sentencing Resource Counsel Project, Federal Public and Community Defenders, and former Special Projects Director, U.S. Sentencing Commission. For a description of the Monitoring Datasets, see U.S. Sent'g Comm'n, Fifteen Years of Guideline Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform app. D at 1 (2004), and U.S. Sentencing Comm'n, 2010/2011 Guide to Publications and Resources 26-28 (2010). Although these particular analyses are not published by the Commission, the data underlying the tables are the same as the data used in the Commission's annual Sourcebook of Federal Sentencing Statistics. The data are publicly available at the Commission's website: http://www.ussc.gov/Research_and_Statistics/Datafiles/index.cfm. Using standard statistical software, such as SAS or SPSS, the Monitoring Dataset can be used to generate a wide variety of tables and graphs beyond those published by the Commission.

# Appendix 4

## Placement of Sentences Relative to Guideline Range
### All Defendants Combined

|  | Frequency | Percent |
|---|---|---|
| Within Range | 540 | 32.8 |
| Above Range | 24 | 1.5 |
| Gov-Spon Below | 290 | 17.6 |
| Non-Gov Sponsored Below | 791 | 48.1 |
| Total | 1645 | 100.0 |

## Placement of Sentences Relative to Guideline Range
### Defendants in Each Criminal History Category

|  |  | Placement of Sentences Relative to Guideline Range | | | | | | Total |
|---|---|---|---|---|---|---|---|---|
|  |  | 1 | 2 | 3 | 4 | 5 | 6 |  |
| Within Range | Count | 384 | 63 | 57 | 16 | 8 | 6 | 534 |
|  | % | 28.6% | 50.8% | 53.8% | 53.3% | 53.3% | 66.7% | 32.8% |
| Above Range | Count | 15 | 2 | 2 | 3 | 2 | 0 | 24 |
|  | % | 1.1% | 1.6% | 1.9% | 10.0% | 13.3% | 0% | 1.5% |
| Gov-Spon Below | Count | 244 | 14 | 17 | 5 | 3 | 2 | 285 |
|  | % | 18.1% | 11.3% | 16.0% | 16.7% | 20.0% | 22.2% | 17.5% |
| Non-Gov Sponsored Below | Count | 702 | 45 | 30 | 6 | 2 | 1 | 786 |
|  | % | 52.2% | 36.3% | 28.3% | 20.0% | 13.3% | 11.1% | 48.3% |
| Total | Count | 1345 | 124 | 106 | 30 | 15 | 9 | 1629 |
|  | % | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

2

# Appendix 4

## Position Relative to the Guideline Range
Defendants in CHCI Receiving the Four Most Common SOC Adjustments*

| | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|
| Within Range | 222 | 26.4 | 26.4 | 26.4 |
| Above Range | 2 | .2 | .2 | 26.7 |
| Gov-Spon Below | 157 | 18.7 | 18.7 | 45.4 |
| Non-Gov Sponsored Below | 459 | 54.6 | 54.6 | 100.0 |
| Total | 840 | 100.0 | 100.0 | |

*Defendants received upward adjustments under 2G2.2(b)(2),(4),(6), and (7)(D).
Includes only defendants sentenced in 2011 under Guidelines Manual in effect later than FY2004

## Position Relative to the Guideline Range
Defendants in CHCI Receiving the Three Most Common SOC Adjustments*

| | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|
| Within Range | 269 | 26.1 | 26.1 | 26.1 |
| Above Range | 3 | .3 | .3 | 26.4 |
| Gov-Spon Below | 195 | 18.9 | 18.9 | 45.3 |
| Non-Gov Sponsored Below | 564 | 54.7 | 54.7 | 100.0 |
| Total | 1031 | 100.0 | 100.0 | |

*Defendants received upward adjustments under 2G2.2(b)(2),(4),and (6).
Includes only defendants sentenced in 2011 under Guidelines Manual in effect later than FY2004

# Appendix 4

## Number of Defendants Receiving Sentences of Various Terms of Imprisonment
### Defendants in Each Criminal History Category

| Length of Prison Sentence Imposed | Criminal History Category | | | | | | Total |
|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | |
| No imprisonment | 14 | 0 | 0 | 0 | 0 | 0 | 14 |
| Up to 6 months* | 30 | 3 | 0 | 0 | 0 | 0 | 33 |
| 6 mos to 1 year | 15 | 0 | 0 | 0 | 0 | 0 | 15 |
| 1 to 2 years | 99 | 4 | 2 | 0 | 1 | 0 | 106 |
| 2 to 5 years | 471 | 14 | 13 | 5 | 0 | 0 | 503 |
| 5 to 10 years | 475 | 58 | 42 | 11 | 5 | 1 | 592 |
| More than 10 years | 253 | 46 | 50 | 15 | 10 | 8 | 382 |
| Total | 1357 | 125 | 107 | 31 | 16 | 9 | 1645 |

* Offenders sentenced at the upper cutoff points are included in the lower category, i.e. "Up to 6 months" includes 6 month sentences.

4

# Appendix 4

## Number of CHCI Defendants Receiving Sentences of Various Terms of Imprisonment
### With Various Chapter 2 Offense Levels

| Length of Prison Sentence Imposed | Chapter 2 Offense Level including Base Offense Level and Specific Offense Adjustments | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 18 | 20 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 |
| No imprisonment | 0 | 1 | 1 | 0 | 1 | 1 | 0 | 2 | 2 | 1 | 0 | 2 | 1 | 0 | 0 | 0 | 2 |
| Up to 6 months* | 0 | 2 | 3 | 0 | 1 | 1 | 1 | 3 | 1 | 1 | 2 | 12 | 1 | 1 | 0 | 0 | 0 |
| 6 mos to 1 year | 0 | 0 | 1 | 0 | 3 | 0 | 1 | 1 | 1 | 1 | 1 | 5 | 0 | 1 | 0 | 1 | 1 |
| 1 to 2 years | 1 | 4 | 8 | 0 | 14 | 6 | 7 | 5 | 8 | 6 | 2 | 26 | 3 | 6 | 1 | 11 | 16 |
| 2 to 5 years | 0 | 2 | 4 | 2 | 19 | 6 | 19 | 39 | 30 | 35 | 18 | 132 | 13 | 82 | 16 | 20 | 32 |
| 5 to 10 years | 0 | 0 | 0 | 1 | 0 | 3 | 0 | 5 | 0 | 22 | 14 | 81 | 19 | 129 | 0 | 19 | 14 |
| More than 10 years | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 2 | 2 | 12 | 17 | 52 | 65 |
| Total | 1 | 9 | 17 | 3 | 41 | 18 | 28 | 55 | 46 | 66 | 38 | 260 | 39 | 231 | 17 | 52 | 65 |

| Length of Prison Sentence Imposed | Chapter 2 Offense Level including Base Offense Level and Specific Offense Adjustments | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 37 | 38 | 39 | 40 | 41 | 42 | 43 | 44 | 45 | 46 | 47 |
| No imprisonment | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Up to 6 months* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6 mos to 1 year | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 to 2 years | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| 2 to 5 years | 19 | 2 | 0 | 19 | 0 | 1 | 1 | 0 | 1 | 0 | 0 |
| 5 to 10 years | 70 | 3 | 3 | 45 | 0 | 1 | 1 | 1 | 1 | 1 | 1 |
| Over 10 years | 53 | 19 | 4 | 81 | 5 | 20 | 0 | 1 | 16 | 1 | 1 |
| Total | 143 | 24 | 7 | 145 | 5 | 21 | 1 | 1 | 18 | 1 | 1 |

* Offenders sentenced at the upper cutoff points are included in the lower category, i.e. "Up to 6 months" includes 6 month sentences.